## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(CONSOLIDATED)** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

-----------------------------------------------------------------------

| | |
|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **ARLINGTON INDUSTRIES, INC.,** | : |
| | : |
| **Defendant** | : |

### MEMORANDUM

Presently before the court in this patent infringement action are the parties'
contentions regarding the proper interpretation of claim terms.  The issues are ripe
for disposition, and the court will enter an order pursuant to <u>Markman v. Westview
Instruments, Inc.,</u> 517 U.S. 370 (1996).

## I.    Factual Background

The patent *sub judice* (patent no. Re. 5,266,050, hereinafter "the '050 patent")
covers quick connect fittings for electrical junction boxes.  (<u>See</u> Doc. 284, Ex. 3.)  It
is a continuation of patent no. 5,171,164 (hereinafter, "the '164 patent") and issued

to employees of Arlington Industries, Inc. ("Arlington").[1]  (See id.)  The patent

describes a new type of electrical connector to replace previous units that required

the use of two hands to screw the device into an electrical junction box.  (See id.)

The patent encompasses eight claims, only one of which Bridgeport Fittings,

Inc. ("Bridgeport"), is alleged to have infringed.[2]   The claim at issue—claim

8—reads as follows:

> A quick connect fitting for an electrical junction box comprising:
>
> a hollow electrical connector through which an electrical conductor
>     may be inserted having a leading end thereof for insertion in a hole
>     in an electrical junction box;
>
> a circular spring metal adaptor surrounding said leading end of said
>     electrical connector which has a leading end, a trailing end, and an
>     intermediate body;
>
> at least two outwardly sprung members carried by said metal adaptor
>     near said trailing end of said adaptor which engage the side walls of
>     the hole in the junction box into which said adaptor is inserted;
>
> at least two spring locking members carried by said metal adaptor that
>     spring inward to a retracted position to permit said adaptor and

---

[1] The '050 patent was assigned to Arlington.  (See Doc. 284, Ex. 3.)

[2] Arlington originally instituted a patent infringement action against
Bridgeport in 2001, alleging that Bridgeport's snap-in connectors infringed various
claims of the '164 and '050 patents.  The memorandum and order of court dated
November 7, 2003 (Doc. 170) construed six disputed terms and denied most of
Bridgeport's request for summary judgment of non-infringement.  Subsequently,
the parties settled the action and Bridgeport signed a Confession of Judgment and
Injunction permanently enjoining it from "directly or indirectly making, using,
selling, offering for sale or importing . . . [the accused products] or any colorable
imitations."  (Doc. 270.)  In 2005, Bridgeport launched a new line of connectors
which Arlington contends infringe claim 8 of the '050 patent and violate the
previous settlement agreement between the parties.

locking members to be inserted in a hole in an electrical junction box and spring outward to lock said electrical connector from being withdrawn through the hole; and

an arrangement on said connector for limiting the distance said connector can be inserted into the hole in the junction box.

(Id. at col. 10.)  The '050 patent also includes a detailed specification, containing descriptions and illustrations of various embodiments of the invention.  (See id., Ex. 3.)

## II.   **Discussion**

An inventor may assert ownership only over those designs encompassed within the claims section of the patent.  See 35 U.S.C. § 112; Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63 (1998); Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170 (2006).  The proper construction of claims is a question of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  It requires the court to determine the "ordinary and customary meaning" of the claim terms as they would be understood by "a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13; see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 290 F. Supp. 2d 508, 519 (M.D. Pa. 2003).  This meaning should be discerned, if possible, from intrinsic evidence, i.e., the language of the patent and its prosecution history.  See Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352, 1355-56 (Fed. Cir. 2004); Novartis Pharm. Corp. v. Abbott Labs., 375 F.3d 1328, 1334-35 (Fed. Cir. 2004).  The court may use extrinsic evidence, e.g., dictionaries, treatises, and expert

testimony, to aid in claim construction, but such evidence is "less significant than the intrinsic record" and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips, 415 F.3d at 1317-19, 1324; see also Home Diagnostics, 381 F.3d at 1355-56.

In using the language of the patent itself, "claims 'must be read in view of the specification,' . . . [which] is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 979 and Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Likewise, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at 1314 (citing Vitronics, 90 F.3d at 1582). To this end, the context in which a claim term is used, the language of other claims in the patent, and the differences among claims can assist the court in construing disputed claim terms. See id. at 1314-15.

Four terms of claim 8 of the '050 patent are in dispute: "circular," "spring metal adaptor," "outwardly sprung members," and "carried by said metal adaptor near said trailing end of said adaptor."[3] (See Docs. 283, 286, 298, 308.) The court will examine them *seriatim*.

---

[3] The undersigned is well aware of my colleague's claim construction of these disputed terms in a separate proceeding. See Arlington Indus., Inc. v. Bridgeport Fittings, Inc., No. 3:06-CV-1105, 2007 WL 4276565 (M.D. Pa. Dec. 4, 2007) (Caputo, J.). Neither party has asserted that I am bound by Judge Caputo's claim construction, and I have undertaken an independent review of the disputed terms based upon the evidence of record.

A.   **"Circular"**

The term "circular" is used in all claims of the '050 patent to describe the spring metal adaptor.  Bridgeport contends that "circular" means "cylindrical or tubular, such that [the adaptor's] diameter is substantially constant along its axial length."[4]  (Doc. 283 at 7.)  Arlington argues that this term should be construed to mean "hav[ing] circular cross sections."  (Doc. 286 at 15.)  The evidence supports Arlington's construction.

To support its proposed construction, Bridgeport notes that the spring metal adaptor is a three-dimensional object and that Arlington's proposed construction focuses on a two-dimensional definition.  Bridgeport argues that Arlington implicitly defined "circular" in the specification of the '050 patent as "cylindrical or tubular, such that its diameter is substantially constant along its axial length" because the specification consistently depicts and describes an adaptor with this characteristic.  See Phillips, 415 F.3d at 1321 ("[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" (citations omitted)).  Along with emphasizing various figures depicting a cylindrical adaptor (see, e.g., Doc. 284, Ex. 3, figs. 11, 15), Bridgeport notes that a "laid-out" view of the adaptor shows a flat rectangular strip of metal

---

[4] In its Markman claim construction brief, Bridgeport also states that "circular" is implicitly defined in the specification as "cylindrical or tubular, such that [the adaptor] has a constant diameter at both the leading end and the trailing end."  (Doc. 283 at 9.)  During the claim construction hearing, however, Bridgeport did not advance this slightly different construction.  (See Doc. 341 at 29.)  Therefore, the court will not address it when construing "circular."

(see id., fig. 10).  Bridgeport contends that "[b]asic geometry dictates that a

'circular' adaptor formed from a rectangle must take the shape of a cylinder."[5]

(Doc. 283 at 8.)  Bridgeport also points to language in the specification and claim 1

that describes the adaptor with a single, constant diameter:

> The spring steel adaptor 20 typically has an outer diameter of 0.845
> inches in its relaxed state. . . .
> * * *
> After being formed into a circular shape, the inside diameter of
> the spring steel adaptor 20 of FIGS. 11, 12, and 13 is typically 0.782
> inches.
> * * *
> Said circular spring metal adaptor being less than a complete
> circle that is of a relaxed diameter less than the diameter of the hole
> into which it is to be inserted . . . .

(Doc. 284, Ex. 3 at cols. 5, 7, 9.)

Bridgeport also relies on the prosecution history to support its proposed

construction.  The U.S. Patent & Trademark Office initially rejected claims 1 and 13

of the parent patent, the '164 patent, in light of the Recker patent.  (See Doc. 308,

Ex. F at 2.)  After amending these claims, Arlington responded to the initial

rejection by stating:

> Recker discloses a connector for attaching electrical cables to outlet
> boxes that utilizes a tubular shell member 16 . . . . The shell member 16
> is a tube that forms a complete undivided circle so there can be no
> *springing apart of the periphery of the tube as provided for in*
> *[Arlington's] broad claims 1 and 13*.  The versatility of [Arlington's]

---

[5] Bridgeport's expert supports this contention.  (Doc. 284, Ex. 7 ¶ 19 ("It is
clear from an elementary consideration of geometry and morphology that one can
not bend a rectangular strip into a cylinder that does not have a constant cross-
section.")).

> circular spring metal adaptor permits it to be used with a variety of
> connectors.

(Doc. 284, Ex. 5 at 5 (emphasis added)).  Bridgeport contends that this response

demonstrates that Arlington defines "circular spring metal adaptor" in the '164

patent, and therefore the '050 patent, as a tube.

Dr. Brian Williamson, Bridgeport's expert in the field of electrical

connectors, testified that "this is a case where one must look to the specification to

illuminate the meaning of [circular]."  (Doc. 341 at 182.)  In doing so, Dr. Williamson

noted that the specification only shows and describes a cylindrical adaptor with

tangs inward and outward from it.  (See id. at 182-83.)  Dr. Williamson also testified

that Arlington could have easily depicted non-constant cross sectional diameters by

showing "phantom rings" to illustrate differences in diameter.  (See id. at 184.)  Dr.

Williamson noted that "[n]othing in the specification demonstrates, or even

suggests, that the patentee ever conceived of, or disclosed in his patent, any adaptor

other than one that had a constant cross-section along its axial length."  (Doc. 284,

Ex. 7 ¶ 21.)

To counter Bridgeport's arguments, Arlington notes that Bridgeport's

proposed construction is contradicted by the preferred embodiment in the

specification because this embodiment discloses a ridge on the body of the spring

metal adaptor with a different diameter than other portions of the adaptor:

> *A ridge 54 is pressed into the spring steel adaptor 20 along its*
> *length* as shown in FIG. 14.  The ridge 54 improves the springing action
> of the outward-bent tensioner tangs 23 and thereby improves the
> electrical continuity between the adaptor and the electrical junction

7

box.  The ridge 54 is typically pressed out to an *outer diameter of 0.875 inches*.

The spring steel adaptor 20 of FIG. 16 is typically *0.838 inches in outer diameter measured across the flat surface of the spring*.

(Doc. 284, Ex. 3 at col. 8, lines 12-19.)  Arlington also emphasizes that "*nowhere* in the entire patent specification or file history of the '050 Patent, or its parent, the '164 Patent, does the patentee describe the adaptor as 'cylindrical,' 'tubular,' or having a diameter that 'remains substantially constant along it axial length.'" (Doc. 286 at 15-16.)  With respect to the prosecution history relied on by Bridgeport, see supra, Arlington contends that the terms "tube" and "tubular" refer to the Recker device, not the circular spring metal adaptor in the '164 and '050 patents. Arlington's expert, Dr. Christopher Rahn, reiterated these arguments during his testimony at the claim construction hearing.  He also stated that the '050 patent does not require the adaptor to be formed from a rectangular strip of metal. (See Doc. 308, Ex. A at 2.)

The court will construe "circular" with respect to the three-dimensional adaptor to mean "having circular cross-sections."  This construction is supported by the claim language and the specification.  The adaptor is described in the claims and the specification as being inserted into a round hole[6] in a junction box.  The

---

[6] Although the patent does not explicitly describe the hole as round, the entire patent, including the figures, reveals that the hole in the junction box is indeed round.  (See, e.g., Doc. 284, Ex. 3 at col. 9, lines 28 (using the term "diameter" when describing the hole)); id. at col. 5, lines 57-59 ("The *diameter* of the standard hole in the electrical junction box . . . is 0.875 inches." (emphasis added))).

claims of the '050 patent do not address the diameter of the adaptor along its axial

plane.  Nor does the specification.  Although the specification describes the flat

surface of the adaptor using a single diameter, the specification is replete with

different diameters at various cross sections of the adaptor where the tangs or ridge

are located.  (See, e.g., Doc. 284, Ex. 3 at col. 8.)  Likewise, there is nothing in the

specification regarding the operation of the adaptor that requires a cylindrical

adaptor.  Therefore, contrary to Bridgeport's assertion, the specification does not

implicitly define "circular" as cylindrical or tubular and the court will not import

such a limitation from the specification.  Accordingly, the court will construe

"circular" to mean "having circular cross-sections."

### B.    "Spring Metal Adaptor"

Bridgeport contends that the term "spring metal adaptor" should be

construed to mean "an adaptor that is a split ring, such that there is a gap which

permits the diameter of the adaptor to be changed."[7]  (Doc. 283 at 21.)  Arlington

argues that this term simply means "an adaptor that is made of spring metal."

(Doc. 286 at 19.)   The evidence does not support Bridgeport's proposed limitation.

---

[7] The meaning of the separate terms "spring metal" and "adaptor" is not in
dispute.  Arlington incorrectly states that the court previously construed the term
"spring metal."  (See Doc. 286 at 20); see also Arlington Indus., Inc. v. Bridgeport
Fittings, Inc., 290 F. Supp. 2d 508, 521-28 (M.D. Pa. 2003) (construing the terms
"surrounding the leading end," "lanced," "carried on the intermediate portion,"
"smooth," "relaxed diameter," and "less than a complete circle").  The court need
not address this issue, however, because the term is not in dispute.

In arguing for the split ring limitation, Bridgeport relies on the specification, claim 7 of the '050 patent, the prosecution history of the parent patent, and expert testimony.  The specification, Bridgeport contends, implicitly defines spring metal adaptor as a split ring because it consistently depicts a split ring and contains the following description:

> The circular metal spring adaptor 20 *has an opening that results from not forming a complete circle.*  When the outward-bent tangs or spring locking members are bent inward to permit the adaptor to be inserted in a hole, there is also a slight reduction in the diameter by the *opening* narrowing, therefore, there are two spring actions involved during insertion.

(Doc. 284, Ex. 3 at col. 3, lines 20-27 (emphasis added)).  Bridgeport also points to the following language in the '164 patent's prosecution history:

> The shell member 16 [of the Recker patent] is a tube that forms a *complete undivided circle* so there can be no springing apart of the periphery of the tube as provided for in [Arlington's] broad claims 1 and 13.  The versatility of [Arlington's] circular spring metal adaptor permits it to be used with a variety of connectors.

(Id., Ex. 5 at 5 (emphasis added)).  Bridgeport argues that this language demonstrates that Arlington "expressly informed the examiner – and the world – that their 'circular spring metal adaptor' was different from Recker because it was *not* a 'complete undivided circle' and therefore permitted 'springing apart of the periphery of the tube.'"  (Doc. 283 at 24.)

Bridgeport's expert, Dr. Williamson, reiterates the arguments above.  He also notes that every embodiment in the specification includes a connector with a shoulder at the leading end and that the specification explains that a *"slight force* is

required to push the spring steel adaptor 20 over the raised shoulder 30 which is

typically 0.848 inches in diameter." (Doc. 284, Ex. 3 at col. 5, lines 38-41 (emphasis

added)). If only slight force is required to push the spring metal adaptor over the

shoulder, Dr. Williamson contends, the adaptor must be split. Dr. Williamson and

Bridgeport note that claim 7 of the '050 patent contains this shoulder requirement

on the connector, but, like claim 8, does not contain an express "split ring"

limitation to the spring metal adaptor of claim 7. Using the measurements of

specific embodiments in the specification, Dr. Williamson argues that claim 7

supports the "split ring" limitation for the term "spring metal adaptor" because an

unsplit adaptor in claim 7 would become permanently deformed when the adaptor

was pushed over the shoulder.[8]

Arlington relies on the difference between claims 1 and 8 of the '050 patent,

the prosecution history of the parent patent and the '050 patent, and expert

testimony to support its proposed construction of "spring metal adaptor." Claim 1

of the '050 patent reads, in pertinent part, as follows:

> A quick connect fitting for an electrical junction box comprising:
> * * *
> a circular spring metal adaptor surrounding said leading end of said
> electrical connector which has a leading end, a trailing end, and an
> intermediate body;
> * * *
> said circular spring metal adaptor being *less than a complete circle* that
> is of a relaxed diameter less than the diameter of the hole into
> which it is to be inserted with said spring locking members

---

[8] Dr. Williamson also believes that claim 8 requires a shoulder on the
connector, despite no such express language in the claim. (See Doc. 341 at 217.)

extending radially outward beyond the diameter of the hole into
which they are to be inserted; . . . .

(Doc. 284, Ex. 3 at col. 9 (emphasis added)).  Notably, Arlington points out, claim 8

does not include the "less than a complete circle" limitation from claim 1.

Arlington asserts that the prosecution history of the '164  and '050 patents

demonstrates that "spring metal adaptor" is not confined to split rings.  The

originally-filed claims 1 and 2 of the '164 patent did not contain a split ring

limitation.[9]  (See Doc. 308, Ex. E at 12.)  Although the Examiner *rejected* originally-

---

[9] Originally-filed claims 1 and 2 of the '164 patent read:

1.     A quick connect fitting for an electrical junction box comprising:

a hollow electrical connector through which an electrical
conductor may be inserted having a leading end thereof for
insertion in a hole in an electrical junction box;

a circular spring metal adaptor surrounding said leading end of
said electrical connector which also has a leading end, a trailing
end, and an intermediate body;

at least two spring locking members carried by said metal
adaptor that spring inward to a retracted position to permit said
adaptor and locking member to be inserted in a hole in an
electrical junction box and spring outward to lock said electrical
connector from being withdrawn through the hole; and

an arrangement on said connector for limiting the distance said
connector can be inserted into the hole in the junction box.

2.     The quick connect fitting of claim 1 which further includes:

at least two outwardly sprung members carried by said metal
adaptor near said trailing end of said adaptor which engage the
side walls of the hole in the junction box into which said adaptor
is inserted.

(Doc. 308, Ex. E at 12.)

filed claim 1 "as being clearly anticipated by Recker" (see id., Ex. F at 2), the

Examiner only *objected to* originally-filed claim 2 because it was dependent on a

rejected base claim, i.e, originally-filed claim 1 (see id. at 3).  Importantly, the

Examiner stated that originally-filed claim 2 "would be allowable if rewritten in

independent form including all the limitations of the base claim and any

intervening claims."  (Id.)  In seeking to have the '164 patent issued, Arlington did

not rewrite claim 2 in independent form.  Instead, Arlington chose to amend

originally-filed claim 1 to include a "less than a complete circle" limitation to

distinguish the claim from the Recker patent.  (See Doc. 284, Ex. 2 at col. 9; see also

Doc. 284, Ex. 5 at 5 ("Both Claims 1 and 13 have been amended in a manner to

distinguish them from Recker.")).[10]  However, in the continuing patent application,

which was issued as the '050 patent, Arlington rewrote originally-filed claim 2 in

independent form and advised the Examiner that:

> Claim [8] is based on combining *original* claims 1 and 2 and
> since the first Official Action in the parent application indicated that
> claim 2 contained allowable subject matter if combined with the
> independent claim, this claim should be allowable.

(Doc. 308, Ex. J at 5 (emphasis added)).  This claim was allowed without objection.

(See id., Ex. K.)  Arlington's expert, Dr. Rahn, reiterates the arguments above.  He

---

[10] Originally-filed independent claim 13 was also rejected by the Examiner "as being clearly anticipated by Recker."  (See Doc. 308, Ex. F at 2.)  As with originally-filed independent claim 1, Arlington amended claim 13 by adding a "split" limitation to the spring metal adaptor.  (Compare Doc. 308, Ex. E at 13-14, with Doc. 284, Ex. 2 at col. 10.)  With the amendments, all claims that issued in the '164 patent contain the "less than a complete circle" or "split" limitation regarding the spring metal adaptor.  (See id. at cols. 8-10.)

also notes that an unsplit adaptor could be "press fit" onto a connector with a shoulder.[11]

The court will construe "spring metal adaptor" to be "an adaptor made of spring metal."  This construction is based on the claim language, the specification,[12] and the prosecution history of the '164 and '050 patents.  Reading in a "split ring" limitation to the term "spring metal adaptor" renders the "less than a complete circle" limitation of claim 1 superfluous.  See AllVoice Computing PLC v. Nuance Commc'ns, Inc., 504 F.3d 1236, 1247 (Fed. Cir. 2007) ("[C]laim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous." (citations omitted)); Phillips, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."); see also Arlington Industries, Inc., 290 F. Supp. 2d at 523.  The presumption of claim differentiation is not rebutted by the specification or prosecution history of the '164 patent, as Bridgeport contends.  Indeed, the prosecution history supports the court's construction as Arlington clearly chose to write claim 8 of the '050 patent without the "split ring" limitation of the '164 patent.  It is undisputed that originally-filed

---

[11] Dr. Williamson acknowledged at least one instance where an unsplit ring goes over a shoulder in a product based on the Conners patent.  (See Doc. 341 at 218.)

[12] The court notes that the specification includes the originally-filed claims. See N. Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 938 (Fed. Cir. 1990) ("The original claims as filed are part of the patent specification.").

claims 1 and 2 of the '164 patent, which became claim 8 of the '050 patent, did *not*

contain a "split ring" limitation.  Notably, while all of the claims of the '164 patent

contain an express "split ring" limitation, only some of the claims in the '050 patent

contain such an express limitation.  See Saunders Group, Inc. v. Comfortrac, Inc.,

492 F.3d 1326 (Fed. Cir. 2007) ("When the patentees filed the continuation

application, they omitted [a] limitation from some, but not all, of the new claims.

Had they omitted the limitation from all of the claims, it might be argued that the

limitation was assumed to be present and did not need to be explicitly recited.

Making such a change to only some of the claims, however, is a strong indication

that the claims not reciting [the limitation] were not intended to require [the

limitation].").

Bridgeport urges the court to read a "split ring" limitation from the

specification into the claims.  The court declines to do so.  Given the language of all

of the claims in the '050 patent and the prosecution history of the '164 and '050

patents, the meaning of "spring metal adaptor" is clear.  The drawings and

language of the specification relied on by Bridgeport and its expert merely refer to

specific embodiments of the invention with split rings.  The specification clearly

warns that such embodiments "should not be construed as limiting the scope of the

invention."  (Doc. 284, Ex. 3 at col. 8.)  See Phillips, 415 F.3d at 1323 ("[A]lthough the

specification often describes very specific embodiments of the invention, we have

repeatedly warned against confining the claims to those embodiments."); see also

PBI Performance Prods., Inc. v. NorFab Corp., 514 F. Supp. 2d 732, 739 (E.D. Pa.

2007).  Therefore, the court will not import a "split ring" limitation from the specification into the claims of the patent.  Accordingly, the court will construe "spring metal adaptor" to be "an adaptor made of spring metal."

### C.   "Outwardly Sprung Members"

Bridgeport contends that the term "outwardly sprung members" should be construed to mean "members bent outward at an angle relative to the normal plane of the adaptor."  (Doc. 341 at 34.)  Arlington argues that "outwardly" means "towards the outside" and "sprung members" means "members that display resiliency."  (Doc. 286 at 26, 29.)  The parties do not appear to dispute that "outwardly" means "towards the outside of the adaptor."  Therefore, the court's analysis will focus on the construction of "sprung members."  The evidence supports Bridgeport's construction.

Bridgeport notes that the "outwardly sprung members" of claim 8 are referred to as tensioner tangs in the specification.[13]  Within the description and operation sections of the specification, these tensioner tangs are discussed twenty-six times and each time are described as "outward-bent."  (See Doc. 284, Ex. 3 at cols. 3-8.)  In addition, Bridgeport states that the figures of the '050 patent consistently and exclusively depict the tensioner tangs as being bent outward, away from the main body of the adaptor.  Bridgeport also supports its proposed construction by pointing to the diameter measurements in the specification—the

---

[13] Arlington does not dispute this assertion.

specification describes the tensioner tangs as having an outer diameter greater than that of the adaptor itself.

Bridgeport's expert, Dr. Williamson, testified at the claim construction hearing regarding the distinction between the terms "spring" and "sprung." According to Dr. Williamson, "spring" involves elastic deformation or resiliency such that an item will bend and return to its starting position.  "Sprung" involves plastic deformation such that an item is permanently bent into a different position. (See Doc. 341 at 188-89.)  Dr. Williamson explained that metal that has been "plastically deformed and sprung in the plastic[] sense does not stop . . . from having elasticity and springiness in the elastic sense."  (Id. at 223.)

Arlington and its expert, Dr. Rahn, argue that the plain and ordinary meaning of "sprung members" is members that display resiliency.  (See Doc. 286 at 29-31; Doc. 341 at 101-02.)  In support of this definition, they point to the dictionary definition.  (See Doc. 286, Ex. C.)  Arlington notes that this resiliency is required for the tensioner tangs to perform their function of maintaining firm contact with the side walls of the junction box to ensure electrical continuity or ground.  Arlington also states that claim 8 involves "an adaptor that has already been formed, heat treated, and assembled" (Doc. 286 at 33), whereas Bridgeport's proposed construction describes the formation of the tensioner tangs.  Finally, Arlington contends that Bridgeport is attempting to import limitations from the embodiments of the specification into claim 8.

The court will construe "outwardly sprung members" to be "members bent outward at an angle relative to the normal plane of the adaptor."  This construction is supported by the claims and the specification.  When claiming other types of members on the adaptor, Arlington chose the term "spring."  For example:

> at least two *spring* locking members carried by said metal adaptor that *spring* inward to a retracted position . . . and *spring* outward to lock said electrical connector from being withdrawn through the hole . . . .

(Doc. 284, Ex. 3 at col. 10 (emphasis added)).  That Arlington chose a different term, "sprung," for the tensioner tangs is indicative of a different meaning.  The court finds that a person of ordinary skill in the art would understand "sprung" to refer to plastic, or permanent, deformation.  This understanding is confirmed by the specification, which always depicts and describes the tensioner tangs as "outward-bent."  Accordingly, the court will construe "outwardly sprung members" to be "members bent outward at an angle relative to the normal plane of the adaptor."

## D.    "Carried by Said Metal Adaptor Near Said Trailing End of Said Adaptor"

The entire third clause of claim 8 reads:

> at least two outwardly sprung members carried by said metal adaptor near said trailing end of said adaptor which engage the side walls of the hole in the junction box into which said adaptor is inserted.

(Doc. 284, Ex. 3 at col. 10.)  Bridgeport argues that the term "carried by said metal adaptor near said trailing end of said adaptor" within this clause should be construed to mean that the outwardly sprung members are "attached to the

18

adaptor at a point that is between the trailing end and the mid-point of the

adaptor." (Doc. 283 at 40.)  Arlington contends that "carried by" means "part of the

metal adaptor" and that "near said trailing end of said adaptor which engage the

side walls of the hole in the junction box" refers to the location where the outwardly

sprung members engage the side walls of the hole in the junction box.  (Doc. 286 at

36.)  The evidence supports Arlington's broader construction.

To support its position, Bridgeport refers to figures in the specification which

only show the outwardly sprung members attached to the adaptor in close

proximity to the trailing end or mid-point of the adaptor, i.e., *not* near the leading

end of the adaptor.  (See Doc. 284, Ex. 3, figs. 1, 4, 8, 11.)  Bridgeport's expert, Dr.

Williamson, opines that the plain and ordinary meaning of the disputed language is

that the outwardly sprung members are attached, or joined, to the adaptor at places

near its trailing end.  (Id., Ex. 7 ¶ 30.)

Bridgeport also argues that Arlington improperly attempts to create two

separate limitations—"carried by said metal adaptor" and "near said trailing end of

said adaptor"—and to read these limitations out of context.  However, it is

Bridgeport's proposed construction that does not consider the entire limitation in

context.[14]  See Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374

(Fed. Cir. 1999) ("Proper claim construction . . . demands interpretation of the

---

[14] Contrary to Bridgeport's assertion, Arlington does not propose a construction for "near said trailing end of said adaptor" alone.  Rather, Arlington proposes a construction for "near said trailing end of said adaptor *which engage the side walls of the hole in the junction*."  (Doc. 286 at 36 (emphasis added)).

entire claim in context, not a single element in isolation.").  The entire third clause

of claim 8 involves the functioning of the outwardly sprung members (i.e., the

tensioner tangs).  This functioning is described in various embodiments in the

specification as follows:

> After the connector is pushed in completely, the three
> outward-bent tensioner tangs 23 exert force on the exterior wall of the
> electrical junction box 38, keeping the connector under tension and
> firmly in place against the wall. . . .

> The outward-bent tensioner tangs 23 provide electrical
> continuity or ground between the spring steel adaptor 20 and the wall
> of the electrical junction box 38 by keeping the two in firm contact. . . .

> * * *

> After the outward-bent locking tangs 22 are locked in place, the
> outward-bent tensioner tangs 23, at 0.910 inch diameter, exert tension
> between the spring steel adaptor 20 and the inner circumference of the
> opening in the electrical junction box.

(Doc. 284, Ex. 3 at cols. 6, 8.)  The specification makes no reference to the outwardly

sprung members being attached or joined to the adaptor.  Nor does it place any

importance on where such "attachment" may occur.  It is clear from the

specification and the claim itself that the importance of the location of the

outwardly sprung members is to enable the members to engage with the wall of the

junction box.  Indeed, the specification reveals that an outward-bent *locking* tang

will become a *tensioner* tang (i.e., an outwardly sprung member) if it does not pass

through the wall of the junction box such that it "provide[s] tension and electrical

continuity between the spring steel adaptor 20 and the electrical junction box."

(See id. at col. 7, lines 4-9.)

The court finds that a person of ordinary skill in the art would *not* give this disputed term the narrow construction that Bridgeport proposes. The specification and the claim reveal a broad meaning that focuses on the functioning of the outwardly sprung members. Accordingly, the court will construe "carried by said metal adaptor near said trailing end of said adaptor" to be "part of said metal adaptor with a portion of each member located near said trailing end of said adaptor."[15]

III.   **Conclusion**

The court will construe the disputed claims as set forth in this decision. An appropriate order will issue.

 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      February 25, 2008

---

[15] Because the court rejects Bridgeport's proposed construction, the court need not address Arlington's judicial estoppel and law of the case arguments (see Doc. 286 at 38-40; Doc. 308 at 50-56).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(CONSOLIDATED)** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

------------------------------------------------------------------------

| | | |
|---|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ARLINGTON INDUSTRIES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

<u>**ORDER**</u>

AND NOW, this 25th day of February, 2008, upon consideration the parties'

contentions regarding the proper construction of claim terms, and for the reasons

set forth in the accompanying memorandum, it is hereby ORDERED that the

following claim construction shall apply in the above-captioned matter:

1.   "Circular spring metal adaptor" means "an adaptor made of spring
     metal that has circular cross sections."

2.   "Outwardly sprung members carried by said metal adaptor near said
     trailing end of said adaptor" means "members bent outward at an
     angle relative to the normal plane of the metal adaptor that are part of
     said adaptor with a portion of each member located near said trailing
     end of said adaptor."

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge