## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(CONSOLIDATED)** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

-------------------------------------------------------------------------

| | | |
|---|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Consolidated Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ARLINGTON INDUSTRIES, INC.,** | : | |
| | : | |
| **Consolidated Defendant** | : | |

## <u>MEMORANDUM</u>

This is a consolidated patent infringement suit.  Bridgeport Fittings, Incorporated ("Bridgeport") requests a judgment declaring that fifteen of its products do not infringe claim 8 of United States Patent Number 5,266,050 (the "'050 patent"), held by Arlington Industries, Incorporated ("Arlington").  Arlington counterclaims and endeavors to hold Bridgeport liable for literally infringing the '050 patent.  Presently before the court are the parties' cross-motions for summary judgment of patent infringement.  (Docs. 382, 385.)  Additionally, Bridgeport moves for summary judgment (1) absolving it of breaching the terms of a settlement agreement entered into by the parties in March 2004, (2) of non-willful

infringement, and (3) to limit the damages period for its potential patent infringement liability. (Docs. 386, 387.) For the reasons that follow, Arlington's motion (Doc. 382) will be denied, and Bridgeport's motions (Docs. 385, 386, 387) will be denied with one exception.

## I.    **Statement of Facts**[1]

Arlington and Bridgeport manufacture and design metallic and non-metallic electrical conduit fittings. (See Doc. 305, Ex. F at 118); http://www.aifittings.com/history.htm (last visited January 29, 2009). Electrical conduit fittings are used to connect electrical wiring and cable. (See Doc. 305, Ex. F at 118.) In 1992, Arlington developed and manufactured a new type of fitting, intended to replace previous units whose installation required the use of two hands to screw the device into an electrical junction box.[2] (See Doc. 384, Ex. A.) This new connector featured a circular spring metal adaptor, to which at least two outwardly sprung members were attached at the trailing end. (See id. at col. 10.) When the adaptor was inserted into the knockout hole of an electrical junction box, its outwardly sprung members locked the adaptor into place. (See id.) Thus, Arlington's connector allowed a user to quickly connect the device to a junction box

---

[1] Given the applicable standard of review, the court will present the facts in the light most favorable to the non-moving party with respect to each motion. See infra Part II.

[2] An electrical junction box is used to run multiple conductors in two or more directions, allowing power to flow simultaneously to various electrical devices.

using one hand instead of two, thereby reducing the time and effort required during installation.  (See id. at col. 1.)

On December 15, 1992, Arlington was awarded United States Patent Number 5,171,164 (the "'164 patent"), which covered the design of the above-described device.  (Doc. 404 ¶ 2; Doc. 432 ¶ 2.)  Arlington acquired the '050 patent the following year.  (Doc. 383 ¶ 1.)  The '050 patent is a "continuation patent," meaning that it shares a common specification with the '164 patent, but includes different claims.  (Doc. 404 ¶ 2; Doc. 432 ¶ 2.)  The '050 patent encompasses eight claims, only one of which is the focus of the instant litigation.  The claim at issue—claim 8—reads as follows:

A quick connect fitting for an electrical junction box comprising:

a hollow electrical connector through which an electrical conductor may be inserted having a leading end thereof for insertion in a hole in an electrical junction box;

a circular spring metal adaptor surrounding said leading end of said electrical connector which has a leading end, a trailing end, and an intermediate body;

at least two outwardly sprung members carried by said metal adaptor near said trailing end of said adaptor which engage the side walls of the hole in the junction box into which said adaptor is inserted;

at least two spring locking members carried by said metal adaptor that spring inward to a retracted position to permit said adaptor and locking members to be inserted in a hole in an electrical junction box and spring outward to lock said electrical connector from being withdrawn through the hole; and

an arrangement on said connector for limiting the distance said connector can be inserted into the hole in the junction box.

(Doc. 384, Ex. A col. 10.)

In 1999, Bridgeport introduced its own product line of quick-connect fittings called the "Snap-In Fitting." (See Doc. 170 at 7-10.) The "Snap-In Fittings" were designed with characteristics nearly identical to those featured in Arlington's patented products. (See Doc. 310 ¶ 2.5.) Arlington filed suit in March 2001, alleging that the "Snap-In Fittings" infringed both the '164 and the '050 patents. (See Doc. 1; Doc. 404 ¶ 1; Doc. 432 ¶ 3.) The parties litigated the dispute for over three years before entering into a settlement agreement (the "Settlement Agreement") resolving the matter on March 28, 2004.[3] (Doc. 404 ¶ 5; Doc. 432 ¶ 4.) The Settlement Agreement required Bridgeport to discontinue permanently its manufacture and sale of the "Snap-In Fittings," as well as "any colorable imitation" thereof.[4] (See Doc. 310; Doc. 404 ¶ 5; see also Doc. 383 ¶ 3; Doc. 432 ¶ 4; Doc. 439 ¶ 3.)

---

[3] For a more thorough recitation of the facts underlying the "Snap-In Fittings" litigation, see Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 290 F. Supp. 2d 508, 513-18 (M.D. Pa. 2003).

[4] Specifically, Bridgeport agreed to "cease importing, manufacturing, selling and offering for sale Snap-In Fittings . . . on March 31, 2004." (Doc. 310 ¶ 3.1.) Additionally, Bridgeport agreed to destroy its remaining Snap-In Fitting inventory and to cease promoting the infringing devices. (See id.)

In September 2005, Bridgeport designed a new quick-connect electrical fitting, which it called the "Whipper-Snap."[5]  (Doc. 404 ¶ 14; Doc. 432 ¶ 14.)  The Whipper-Snap is similar to the '050 patent, in that it features a circular spring metal adaptor that is affixed atop a hollow connector body.  (See Doc. 383 ¶ 9(a); Doc. 438 at 1; Doc. 439 ¶ 9(a)).  Attached to the leading end of the adaptor are a total of four tensioning tangs and two anchoring tabs.  (See Doc. 383 ¶ 11(d)-(e); Doc. 394, Ex. A ¶ 34; Doc. 404 ¶¶ 43-44.)  The tensioning tangs' purpose is twofold: (1) to lock the adaptor securely in position when the fitting is inserted into a knockout hole, and (2) to thereafter "maintain good electrical continuity, or ground, between the electrical connector, the junction box and the electrical source leading to the box." (See Doc. 384, Ex. K ¶¶ 17, 20; Doc. 394, Ex. A ¶¶ 36, 44; Doc. 401 at 16-18; Doc. 425, Ex. M at 85-88; Doc. 439 ¶ 11(d)).  The purpose of the anchoring tabs is to fasten the spring metal adaptor durably to the hollow connector body.  (See Doc. 394, Ex. A ¶ 38.)

Bridgeport introduced a total of fifteen separate electrical fittings utilizing the "Whipper-Snap" design.[6]  (Doc. 404 ¶ 15; Doc. 432 ¶ 14.)  Arlington contends that

---

[5] Bridgeport's president, Delbert Auray ("Auray"), describes the Whipper-Snap as a "quick install product" that allows a user to "quickly connect wire and cable" by inserting the device into the knockout hole of an electrical junction box. (Doc. 305, Ex. F at 118, 150-51; Doc. 383 ¶¶ 9(a)-(b); Doc. 439 ¶¶ 9(a)-(b), (d)).

[6] Bridgeport designates the "Whipper-Snap" products using the following catalog numbers: 38ASP, 380SP, 3838ASP, 3838SP, 651SP, 802SP, 8400SP, 846SP, 841SP, 850SP, SG38ASP, SG38SP, SG38MCIA, GF38SP, and GF50SP.  (Doc. 383 ¶ 2; Doc. 404 ¶ 15.)

each of these fifteen products (collectively, the "accused products") literally infringe claim 8 of the '050 patent.[7]   (See, e.g., Doc. 396 at 1.)  Bridgeport rejects this notion and asserts that its products are covered by the claims of United States Patent Number 6,916,988 (the "'988 patent), which it owns.[8]  After years of litigation, the scope of the parties' dispute has narrowed significantly.  In fact, with one exception, the parties agree that the accused products meet each of the limitations identified in claim 8 of the '050 patent.  (See Doc. 438 at 1; Doc. 453 at 1.)

The crux of this dispute concerns claim 8's limitation requiring that the quick connect fitting feature "at least two outwardly sprung members" attached to its spring metal adaptor.  (See Doc. 384, Ex. A at col. 10.)  On February 25, 2008, the court issued a Markman ruling construing "outwardly sprung members" to mean "members bent outward at an angle relative to the normal plane of the adaptor."[9]

---

[7] The parties agree that the "accused products" are "fully assembled connectors with the adaptors placed on the connector body."  (Doc. 383 ¶ 11(b); Doc. 439 ¶ 11(b)).

[8] The '988 patent covers an "electrical connector with frustro conical snap fit retaining ring," which is "a further advancement in the field of electrical connector assemblies having a snap fit retaining ring circumscribing the outlet end of a connector body for effecting a snap fit connection to an electrical box."  (Doc. 305, Ex. J.)  The validity of the '988 patent is not disputed by the parties, and thus the extent to which one or more of its claims read on the accused products is tangential—and largely immaterial—to the court's inquiry.

[9] The court's Markman ruling also construed three additional limitations contained in claim 8: (1) circular, (2) spring metal adaptor, and (3) carried by said metal adaptor near said trailing end of said adaptor.  (See Doc. 376.)  Prior to the Markman ruling, Bridgeport disputed the contention that these particular limitations read on the accused products.  (See Doc. 283.)  Bridgeport no longer raises these objections.  (See Doc. 438 at 1.)

(Doc. 376 at 18.)  The central question presented by the motions *sub judice* is whether the accused products' tensioning tangs constitute members "bent outward at an angle relative to the normal plane of the adaptor."

Bridgeport contends that the accused products' tensioning tangs are co-conical with, and lie in the normal plane of, the adaptor.  (Doc. 404 ¶¶ 44-47; Doc. 439 ¶ 11(e)).  The trailing end of the adaptor possesses a diameter greater than that of the adaptor's leading end.  (Doc. 383 ¶ 13(a); Doc. 404 ¶ 29; Doc. 432 ¶ 29; 439 ¶ 13(a)).  Thus, the adaptor's diameter increases along its axial length from the leading to the trailing end, yielding what Bridgeport characterizes as the adaptor's "frustro-conical shape."  (See Doc. 404 ¶¶ 44-47.)  The leading end's smaller diameter allows a user to slide the adaptor into a knockout hole with ease.  (See Doc. 432 ¶ 44; Doc. 433, Ex. C ¶ 5.)  As the connector is inserted further into the hole, the trailing end's larger diameter presses against the junction box walls, forcing the tensioning tangs to compress and spring inward.  (See Doc. 432 ¶ 29; Doc. 439 ¶ 11(d)).  Bridgeport claims that the fully inserted tangs maintain this inward flex, furnishing the tension that locks the adaptor into place against the walls of the junction box.  (See Doc. 439 ¶ 11(d)).

Arlington agrees that the trailing end of the accused products' adaptor is larger than its leading end, (see Doc. 383 ¶ 13(a); Doc. 432 ¶ 29), but disputes the notion that the tensioning tangs lie in the normal plane of the adaptor, (see, e.g., Doc. 432 ¶¶ 43-46).  Arlington underscores the importance of two raised sections—referred to by the parties as the "raised S areas"—that run along opposite

7

sides of the connector's outbound end.[10]  (See Doc. 383 ¶ 11(f)).  When the accused

products' spring metal adaptor is affixed to the outbound end of the connector,

each of the four tensioning tangs rest atop the raised S areas.  (Doc. 383 ¶ 11(f); Doc.

383, Ex. D at 87.)  This positioning allegedly pushes the tangs permanently away

from the adaptor plane.  (See id. ¶ 11(f); Doc. 432 ¶ 45.)  According to Arlington, the

raised S areas bend the tangs "outward at an angle relative to the normal plane of

the adaptor."  (See Doc. 383 ¶ 11(d)-(f); Doc. 432 ¶ 45(d)-(f)).

On November 18, 2005, Bridgeport's counsel was contacted by counsel for

Arlington, who expressed concerns about the design of the accused products.  (Doc.

303 ¶ 1; Doc. 404 ¶ 16; Doc. 432 ¶ 16.)  A meeting was arranged for December 6, 2005,

at which time Arlington suggested that the accused products infringed claim 8 of

the '050 patent.  (Doc. 404 ¶ 17; Doc. 432 ¶ 17.)  Furthermore, Arlington's counsel

accused Bridgeport of manufacturing a "colorable imitation" of its Snap-In Fitting,

and of thereby violating the terms of the Settlement Agreement.  (See Doc. 404 ¶ 18;

Doc. 432 ¶ 18.)  Thirteen days later, Bridgeport filed a complaint for declaratory

judgment, initiating the instant matter.  (Civil Action No. 3:05-CV-2622, Doc. 1.)

---

[10] Kiely describes the "raised S area" as "an area that is raised from the . . . circumference of the outbound end" of the connector.  (Doc. 384, Ex. D at 85.)  The "raised S area" is visually depicted in Figure 21 of United States Patent Number 7,075,007, held by Bridgeport.  (See id. at Dep. Ex. 12.)

Bridgeport's complaint seeks a judgment declaring that the accused products do not infringe the '050 patent, either literally or under the doctrine of equivalents.[11] (See id. ¶¶ 20-21.)  On February 2, 2006, Arlington filed counterclaims to Bridgeport's complaint for declaratory judgment, alleging: (1) the accused products infringe the '050 patent, and (2) Bridgeport's manufacture, use, and sale of the accused products constitutes a breach of the Settlement Agreement.[12] [13]  (See Civil

---

[11] Bridgeport invokes the court's original jurisdiction over patent suits under 28 U.S.C. § 1338(a), as well as the court's authority to declare the legal rights of a party under 28 U.S.C. § 2201.  When a party requests a declaratory judgment in the context of a patent dispute, the Federal Circuit employs a two-part inquiry to ensure the existence of an actual controversy.  Under this test, "there must be both (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity by the declaratory judgment plaintiff which could constitute infringement."  Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1330 (Fed. Cir. 2005); see also MedImmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1379 (Fed. Cir. 2005), vacated on other grounds, MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).  In the instant case, Bridgeport filed its complaint based, in part, upon Arlington's direct threat of a patent infringement suit of its own.  (See Doc. 404 ¶¶ 16-18; Doc. 432 ¶¶ 16-18.)  Thus, the turbulence building between the parties is sufficient to constitute an actual controversy, rendering the court's exercise of jurisdiction proper.

[12] Both Bridgeport and Arlington initially raised claims invoking the Lanham Act, 15 U.S.C. § 1125.  (See Civil Action No. 3:05-CV-2622, Doc. 1 ¶¶ 22-23; Doc. 18 ¶¶ 12-17.)  By the order dated May 9, 2008, these claims were dismissed and are not presently before the court.  (Doc. 415.)

[13] On January 26, 2006, Arlington moved to enter Bridgeport's confession of judgment and injunction in the above-captioned matter, contending that Bridgeport breached the Settlement Agreement by manufacturing and selling a colorable imitation of the Snap-In Fittings.  (Doc. 253.)  The court then consolidated the declaratory judgment action with the above-captioned matter on April 6, 2006, recognizing that the cases involved common parties and common questions of fact and law.  (See Doc. 267.)  On June 30, 2006, the court formally granted Arlington's motion to enter the confession of judgment and injunction.  (See Doc. 269.)

Action No. 3:05-CV-2622, Doc. 18 ¶¶ 7-11, 18-23.)  After extensive discovery, the

court held a <u>Markman</u> hearing and construed the disputed claims of the '050 patent.

(Doc. 376.)

      On May 1, 2008, the parties filed cross-motions for summary judgment.

(Docs. 382, 385, 386, 387.)  Arlington requests a judgment pronouncing that the

accused Bridgeport products literally infringe claim 8 of the '050 patent.  (<u>See</u> Doc.

382.)  Bridgeport seeks summary judgment that (1) the accused products do not

infringe claim 8 literally or under the doctrine of equivalents; (2) the manufacture

and sale of the accused products does not constitute a breach of the Settlement

Agreement; and (3) Bridgeport is not liable for willful infringement of claim 8, nor

any infringement damages prior to December 6, 2005.  (<u>See</u> Docs. 385, 386, 387.)

The cross-motions have been fully briefed and are ripe for disposition.

## II.   <u>Standard of Review</u>

      Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  The

burden of proof is upon the non-moving party to come forth with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

<u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P.

56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence

must be adequate, as a matter of law, to sustain a judgment in favor of the non-

moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-

57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

(1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause

of action proceed.  Pappas, 331 F. Supp. 2d at 315.

In the instant matter, the parties have filed cross-motions for summary

judgment of infringement.  According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such inherently
> contradictory claims does not constitute an agreement that if one is
> rejected the other is necessarily justified or that the losing party waives
> judicial consideration and determination whether genuine issues of
> material fact exist.

Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008) (quoting Rains v. Cascade

Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  Each movant must show that no

genuine issue of material fact exists; if both parties fail to carry their respective

burdens, the court must deny the motions.  See Facenda v. N.F.L. Films, Inc., 542

F.3d 1007, 1023 (3d Cir. 2008).

## III.  Discussion

A party who "without authority makes, uses, offers to sell, or sells any

patented invention" may be held liable to the patent owner for patent infringement.

35 U.S.C. § 271(a); see also 35 U.S.C. § 281 ("A patentee shall have remedy by civil

action for infringement of a patent.").  "Victory in an infringement suit requires a

finding that the patent claim covers the alleged infringer's product or process,

which in turn necessitates a determination of what the words in the claim mean."

Markman v. Westview Instruments, Inc., 517 U.S. 370, 374 (1996) (quoting H.

SCHWARTZ, PATENT LAW AND PRACTICE 1, 80 (2d ed. 1995)).  Thus, determining

whether an accused device infringes a patented invention requires a two-step

analysis.  Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d

1167, 1176-77 (Fed. Cir. 2002).  First, the court must ascertain the proper

construction of the patent's claims; this is a question of law.  Markman, 517 U.S. at

384; Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998).  In the second

step, the trier of fact must compare the allegedly infringing device with the properly

construed patent claim.  Research Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d

1290, 1295 (Fed. Cir. 2005); Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1575

(Fed. Cir. 1995).  "To prove infringement, the patentee must show that the accused

device meets each claim limitation, either literally or under the doctrine of

equivalents."  Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273

(Fed. Cir. 2004).

In the instant matter, the first step in the infringement analysis is complete,

and the court has construed claim 8 of the '050 patent as a matter of law.  (See Doc.

376.)  The disagreement at the heart of the parties' summary judgment motions

concerns step two of the inquiry: comparison of the accused products with claim 8's

properly construed limitations.  Arlington asserts that the accused products literally

infringe claim 8; Bridgeport argues that its products do not infringe either literally

or under the doctrine of equivalents.  Additionally, Bridgeport moves for summary

determinations absolving it of breaching the Settlement Agreement, willful

infringement, and liability for infringement damages prior to December 6, 2005. The court will address these claims *seriatim*.

###   A.   **Literal Infringement**

A patent claim is literally infringed when each limitation of the properly construed claim is found in the accused device.  Jansen v. Rexall Sundown, Inc., 342 F.3d 1329, 1332 (Fed. Cir. 2003); Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed. Cir. 2002).  Literal infringement is a question for the trier of fact.  Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1302 (Fed. Cir. 2005); Bai v. L. & L. Wings, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  Courts may properly resolve literal infringement claims at the summary judgment stage "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."  Bai, 160 F.3d at 1353; see also Catalina, 289 F.3d at 812 ("Summary judgment of no literal infringement is proper when, construing the facts in a manner most favorable to the nonmovant, no reasonable jury could find that the accused system meets every limitation recited in the properly construed claims.").  The Federal Circuit has cautioned district courts to "approach a motion for summary judgment on the fact issue of infringement with great care."  Cole v. Kimberly-Clark Corp., 102 F.3d 524, 528 (Fed. Cir. 1996).

The parties to an infringement suit often do not dispute the physical composition of the accused product, allowing the literal infringement analysis to "collapse[] into claim construction—a matter of law—amenable to summary

judgment." <u>Desper Prods. v. QSound Labs., Inc.</u>, 157 F.3d 1325, 1332-33 (Fed. Cir. 1998).  Contrary to the parties' assertions, (<u>see, e.g.</u>, Doc. 401 at 3-4), the instant matter does not present such a circumstance.  Rather, the disagreement in this case centers upon claim 8's requirement that the accused products feature "at least two outwardly sprung members" attached to a spring metal adaptor.  (<u>See</u> Doc. 384, Ex. A col. 10.)  This limitation necessitates products with "members bent outward at an angle relative to the normal plane of the adaptor."  (Doc. 376 at 18.)  Bridgeport contends that the accused products' tensioning tangs "are co-conical with the main body of the adaptor, and lie in the normal plane of the adaptor."  (Doc. 401 at 6.) Arlington argues that the tangs are bent outward at an angle relative to the normal adaptor plane.  Thus, the physical composition of the accused product is clearly a factual  matter about which the parties disagree.

  1. <u>**Arlington's Motion**</u>

   In support of its motion, Arlington contends that the self-evident effect of the raised S areas on the connector's outbound end is to bend the tensioning tangs away from the normal plane of the adaptor when the adaptor is fully assembled

atop the connector body.[14]  (See Doc. 396 at 10-11.)  Arlington provides the court

with several photographs purportedly depicting the "outward" character of the

tensioning tangs, as well as the elevated, ramp-like S area that the assembled tangs

must slide atop.  (Id. at 11-12.)

Additionally, Arlington offers empirical data collected by its infringement

expert, Christopher Rahn ("Rahn"), as well as the '050 patent inventor, Daniel

O'Neil ("O'Neil").  Both Rahn and O'Neil independently measured the trailing end

diameter between opposing pairs of tensioning tangs on sixty individual 38ASP

fittings.  (See Doc. 384, Ex. K ¶ 15; Doc. 384, Ex. S.)  For each individual fitting, they

compared the diameter between the trailing end of the tangs with the diameter

between the anchoring tabs positioned at the leading end of the adaptor.[15]  Rahn

---

[14] In order to infringe the '050 patent, the outwardly sprung members of the
accused products must remain in a state of "plastic, or permanent, deformation."
(Doc. 376 at 18.)  Proof of infringement requires a demonstration that the tensioning
tangs on a fully assembled device are permanently bent at an angle relative to the
normal adaptor plane.  Bridgeport spends a considerable measure of ink, however,
delineating the characteristics of the unassembled component parts of its accused
products.  For example, Bridgeport offers measurements of the diameter between
pairs of tensioning tangs prior to assembly, and compares these pre-assembly
measurements with the diameter between tangs *after* an adaptor has been removed
from a connector body.  (See, e.g., Doc. 438 at 23-26.)  The apparent intent of this
presentation is to illustrate the impermanence of any bending suffered by the
tensioning tangs during full assembly.  Bridgeport misapprehends the point at
which the tensioning tangs must be permanently bent.  The parties agree that the
products accused of patent infringement are *fully assembled* electrical fittings, see
supra note 7; "permanently bent" thus refers to a condition of the tensioning tangs
that must persist so long as the device is fully assembled.

[15] Rahn states that the diameter between the anchoring tabs represents a
"measurement across the body of the adaptor."  (Doc. 384, Ex. K ¶ 15; see also Doc.
394, Ex. A ¶ 35.)

found that 119 out of 120 pairs of tensioning tangs had diameters greater than the diameter between the anchoring tabs located upon the corresponding adaptor; O'Neil observed this phenomena in 120 out of 120 pairs. Rahn explains that, on average, the tangs' trailing end diameter is 0.914 inches, while the average diameter between anchoring tabs is 0.898 inches. (See Doc. 383 ¶ 11(i); Doc. 394, Ex. C.) Based upon these measurements, Rahn concludes that the accused products' tensioning tangs "have a larger diameter at the trailing end than the main body of the adaptor, and are therefore bent away from the main body." (Doc. 384, Ex. K ¶ 18.)

O'Neil also performed a similar series of measurements upon sixteen individual 3838ASP fittings. (See Doc. 384, Ex. S.) On each of the sixteen adaptors he examined, O'Neil observed that the trailing end diameter between opposing tangs was greater than that of the diameter between anchoring tabs at the leading end of the adaptor body. (Id.) Arlington argues that the findings of both Rahn and O'Neil—coupled with the photographic evidence and the testimony regarding the raised S area—illustrate that the accused products possess tensioning tangs bent outward at an angle relative to the normal plane of the adaptor. (See Doc. 396 at 10-16.)

The central deficiency in Arlington's proof is its failure to depict the "normal plane of the adaptor," away from which the tensioning tangs are purportedly bent outward at an angle. This omission is especially glaring in light of Bridgeport's assertion that the anchoring tabs and tensioning tangs are co-conical with, and lie

16

in the normal plane of, the adaptor.  (Doc. 438 at 4.)  It is apparent that the parties have divergent views of the juxtaposition of the tangs and the "normal plane of the adaptor" and, hence, in the absence of an agreement on the same, the court is unable to determine whether the tensioning tangs are bent outward at an angle therefrom.  Furthermore, Arlington offers no angular measurements and, while the photographs clearly show the accused products' conical shape, the evidence does little to clarify the extent to which the tensioning tangs are "outwardly sprung."[16]

Similarly, Rahn and O'Neil's measurements fail to show that the tensioning tangs are *necessarily* bent outside the normal plane of the adaptor.  Bridgeport correctly underscores the deficiency: "The measurements taken across the [trailing end] of the tensioning tangs do not measure the angle of the tensioning tangs." (Doc. 438 at 22.)  Bridgeport's expert, John Brian Williamson ("Williamson"), describes the tangs as "l[ying] in the curved surface of the cone."  (Doc. 394, Ex. A ¶ 34.)  Williamson explains that the measurements recorded by Rahn and O'Neil are simply illustrative of the products' frustro-conical shape.  (Id. ¶¶ 34-40.) Additionally, Bridgeport design engineer Kenneth Kiely ("Kiely") testified that the raised S area has no effect on the tensioning tangs during assembly, nor does it hold the tangs in an "outward" position.  (See Doc. 433, Ex. M at 85-87.)  Kiely's testimony is consistent with Bridgeport's assertion that the tensioning tangs' larger

---

[16] Arlington baldly asserts, "If the tensioning tangs actually were co-conical with the rest of the adaptor, they certainly would not be able to compress before the rest of the adaptor."  (Doc. 453 at 16.)  No explanation is provided, which is curious given that the logic of this assertion is far from inescapable.

17

trailing end diameter simply reflects the conical shape of the adaptor, as opposed to "outwardly sprung members."  According to Bridgeport, the tangs' conical design allows them to rest atop the raised S areas, but the areas do nothing to alter the tangs' shape relative to the normal plane of the adaptor.  Absent more thorough evidence depicting the adaptor's normal plane, as well as the tangs' relative angle

thereto, a jury could reasonably credit the testimony of Williamson and Kiely, and

find that the tangs simply lie within the accused products' frustro-conical plane.[17]

Arlington's evidence is also deficient in another respect: Arlington seeks

judgment as a matter of law regarding fifteen different Bridgeport products, but

offers empirical data and argument concerning just two of those products.

Bridgeport asserts that the "connector bodies and adaptors for these various

---

[17] Arlington argues that Kiely admitted in his deposition that the tensioning
tangs are "ben[t] out" as the adaptor is affixed atop the connector body.  (Doc. 396
at 11-14.)  Arlington points to a passage in which Kiely is asked about the design
intent behind the raised S area.  He explains, "As the locking device is pushed
through the knock-out hole, the idea was to cantilever Item 61A [the raised S area]
and create more tension in the knock-out hole."  (Doc. 433, Ex. M at 85.)  Kiely adds
that the leading end of the adaptor "bend[s] sooner than the rest of the locking
device."  (Id.)  As the questioning progresses, the focus appears to shift from the
cantilever effect that occurs when the leading end of the adaptor is inserted into a
junction box, to the interaction between the raised S area and the tensioning tangs.
Kiely then testifies as follows:

> Q.    Okay.  Well, just for the record, what part of the adaptor is the raised
>        "S" intended to affect?
> A.    The four little tabs, two on each side.
> Q.    The tensioning tangs?
> A.    If that's what they're called in the patent.  Yes.
> Q.    All right.  When you say "cantilevered," do you mean bended out?
> A.    Bending, yes.

(Id. at 88-89.)  Arlington argues that Kiely thereby admitted that the tensioning
tangs are "bended out" from the normal plane of the adaptor.  However, it is
unclear from the questioning whether Kiely is referring to the cantilevering that
occurs when the leading end is inserted into a knockout hole, or to something else.
Viewed in the light most favorable to Bridgeport, Kiely's response is equivocal at
best, and insufficient to constitute an admission that the tensioning tangs were
designed to bend outward when assembled atop the connector body.  Even if it
were, an inventor's design intent is not an element of infringement.  See Hilton
Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512, 1519 (Fed. Cir. 1995), rev'd
on other grounds, 520 U.S. 17 (1997).

models are manufactured using different dies, and there is no evidence that the dimensions of all the models are identical." (Doc. 438 at 16 n.10.) Arlington characterizes this contention as "disingenuous" given Bridgeport's "consistent[] [admission] that the Whipper-snap adaptor is the same for all products." (Doc. 453 at 15 n.11.) Arlington neglects to cite the court to Bridgeport's alleged admissions in the record, and the court likewise found none.

The record does contain an affidavit supplied by Kiely, however, in which he states: "Although not all of the Whipper-Snap products use the same adaptors, the only significant difference between the adaptors is the diameter of the opening at the leading end of the adaptor." (Doc. 304 (incorporated into the summary judgment record by Doc. 404 ¶ 25)). This difference is potentially significant. Rahn and O'Neil proffer data comparing the diameter between the anchoring tabs at the leading end of the adaptor with the diameter between the tensioning tangs at the adaptor's trailing end. Their measurements are taken from just two of the fifteen accused products, the 38ASP and the 3838ASP. Arlington argues that the differences in diameter between the adaptors' respective ends—as measured on these two products—conclusively shows that the tensioning tangs on each of the fifteen accused products are bent outward at an angle relative to the normal plane of the adaptor. Kiely's affidavit suggests that the diameter across the anchoring tabs at the adaptor's leading end may not be constant across the Whipper-Snap product line; it is unclear to what extent this inconstancy may affect Rahn and O'Neil's comparison of trailing and leading end diameters.

If Arlington wishes to rely upon expert testimony contrasting the diameters of the accused products' adaptors—and the leading end diameter is not constant across each of the fifteen accused products—then Arlington must present evidence with respect to each individual accused product in order to summarily prevail.  <u>See</u> <u>Shaw v. Stackhouse</u>, 920 F.2d 1135, 1142 (3d Cir. 1990) (holding that the factual assumptions underlying an expert's opinions must draw factual "support in the record").  As the record now stands, Bridgeport has come forth with affirmative evidence upon which a reasonable jury could find that the accused products' tensioning tangs are not bent outward at an angle relative to the normal plane of the adaptor, but instead lie in the normal adaptor plane.  Summary judgment of literal infringement is therefore inappropriate.

### 2. __Bridgeport's Motion__

In its motion for summary judgment of non-infringement, Bridgeport asserts that the accused products lack "outwardly sprung members," and thus do not literally infringe claim 8 of the '050 patent.  Specifically, Bridgeport argues that the accused products' tensioning tangs lie in the normal plane of the adaptor, and thus fall outside the claim construction reflected in the court's <u>Markman</u> ruling.  This contention is insufficient to entitle Bridgeport to summary judgment.

The '050 patent requires "at least two outwardly sprung members," which the court construed as "members bent outward at an angle relative to the normal plane of the adaptor."  (Doc. 376 at 18.)  Bridgeport claims that the tensioning tangs on the accused products are co-conical with the adaptor and "occupy precisely the

21

same plane and establish the 'normal' plane of the adaptor. . . . [T]he tensioning tangs actually define the main body and the normal plane of the adaptor." (Doc. 401 at 7-8.)  In support of this contention, Williamson explains that the "tensioning tangs lie in the curved surface of the cone[;] they are not sprung outwardly from that surface." (Doc. 394, Ex. A ¶ 34.)  Williamson's opinion represents the sum total of the relevant evidence Bridgeport puts forth in support of its motion.[18] (See Doc. 401 at 5-13.)

Bridgeport is entitled to summary judgment only if it can establish that no reasonable jury could find that the accused products's tensioning tangs are bent outward at an angle relative to the normal plane of the adaptor.  See Catalina, 289 F.3d at 812.  Bridgeport's motion suffers from a deficiency similar to that identified in Arlington's moving papers, to wit: a factual dispute over the angle of the tensioning tangs to the plane of the adaptor.  Arlington's opposition brief exposes this dispute of material fact, highlighting an array of photographs that show the accused products' tensioning tangs jutting outward from the leading end of the adaptor.  (Doc. 427 at 8-9.)  Additionally, Arlington proffers Kiely's deposition testimony, wherein he indicates that the tensioning tangs "ride upon" and "are

---

[18] Bridgeport also offers engineering drawings that purportedly illustrate the tangs' co-conical position in the normal plane of the adaptor.  (See Doc. 401 at 6-8.) Absent from Bridgeport's presentation is an explanation detailing *how* the engineering drawings illustrate this fact and, more importantly, the drawings fail to establish the *undisputed* angle of the tangs vis-à-vis *undisputed* parameters of the normal plane of the adaptor.  The court has examined the engineering drawings and it is far from self-evident that the tangs lie in the normal adaptor plane.

being held under tension more by that raised area 'S.'" (Doc. 433, Ex. M at 87.)  The

raised S area purportedly bends and holds the tangs at an outward angle, a

condition illustrated in the photographs of the accused products.

Arlington also sets forth the above-described empirical data gathered by

Rahn and O'Neil.  Rahn concludes from his data that the accused products "have a

larger diameter at the trailing end than the main body of the adaptor, and are

therefore bent away from the main body." (Doc. 384, Ex. K ¶ 18.)  It is certainly

plausible that the trailing end diameter exceeds that located on the leading end

because the tangs bend outward at an angle relative to the normal adaptor plane.  A

factfinder assessing the photographs, Kiely's description of the accused products,

and the expert testimony could reasonably find in Arlington's favor.  Bridgeport's

evidence is thus inadequate to resolve this factual dispute, rendering summary

judgment improper.

## B.   <u>Doctrine of Equivalents</u>

The doctrine of equivalents holds that an accused product or process that

does not literally infringe a patent claim may nonetheless infringe the claim if the

product or process is the substantial equivalent of the patented invention.  <u>Festo</u>

<u>Corp. v. Shoketsu Kinzoku Kogyo Kabuskiki Co.</u>, 535 U.S. 722, 732 (2002); <u>Sage</u>

<u>Prods., Inc. v. Devon Indus., Inc.</u>, 126 F.3d 1420, 1423 (Fed. Cir. 1997).  The doctrine

is implicated when "two devices do the same work in substantially the same way,

and accomplish substantially the same result."  <u>Graver Tank & Mfg. v. Linde Air</u>

<u>Prods. Co.</u>, 339 U.S. 605, 608 (1950); <u>AquaTex Indus. v. Techniche Solutions</u>, 479

F.3d 1320, 1326 (Fed. Cir. 2007) (applying the doctrine when "the difference

between the claimed invention and the accused product or method [is]

insubstantial or . . . the accused product or method performs the substantially same

function in substantially the same way with substantially the same result as each

claim limitation of the patented product or method"). Thus, patentees "may lay

claim to those insubstantial alterations that were not captured in drafting the

original patent claim but which could be created through trivial changes." Conoco,

Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1363 (Fed. Cir. 2006). It is

improper, however, to apply the doctrine to the invention as a whole. Warner-

Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997). Rather, the trier of

fact must analyze individual elements of the accused device to discern "if only

'insubstantial differences' distinguish the missing claim element from the

corresponding aspects of the accused device." Sage Prods., 126 F.3d at 1423; see

also Warner-Jenkinson, 520 U.S. at 29. Equivalence is a question for the trier of

fact, determined at the time of infringement. See Warner-Jenkinson, 520 U.S. at 37;

Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1376 (Fed. Cir.

2001).

    In certain instances, a party may be prohibited from invoking the doctrine of

equivalents by prosecution history estoppel. See Festo, 535 U.S. at 733. When a

patent applicant narrows his or her patent claim during the course of patent

prosecution, that which was voluntarily relinquished ordinarily may not be

recaptured via the doctrine of equivalents. See Warner-Jenkinson, 520 U.S. at 30;

AquaTex, 479 F.3d at 1325.  Prosecution history estoppel may arise during patent

prosecution in one of two ways: "either (1) by making a narrowing amendment to

the claim ('amendment-based estoppel') or (2) by surrendering the claim scope

through argument to the patent examiner ('argument-based estoppel')."  Conoco,

Inc., 460 F.3d at 1363.  The simultaneous "rewriting of dependent claims into

independent form coupled with the cancellation of the original independent claims

creates a presumption of prosecution history estoppel."  Honeywell Int'l v.

Hamilton Sundstrand Corp., 370 F.3d 1131, 1134 (Fed. Cir. 2004).

In the motion *sub judice*, Bridgeport contends that prosecution history

estoppel bars Arlington from availing itself of the doctrine of equivalents.  During

prosecution of the '164 patent, the Examiner rejected originally-filed independent

claim 1 "as being clearly anticipated by [the prior art]."  (Doc. 376 at 13.)  The

Examiner objected to, but did not reject, originally-filed dependent claim 2.  (Id.)

Bridgeport asserts that Arlington narrowed originally-filed claim 1 by combining it

with originally-filed dependent claim 2, a combination that eventually became

independent claim 8 of the '050 patent.  (Doc. 401 at 14.)  Consequently, Bridgeport

urges the court to apply the Honeywell presumption:  Arlington rewrote

independent claim 1 utilizing the limitations of dependent claim 2 and produced

independent claim 8 of the '050 patent, thereby estopping its instant recapture of

that which it formerly gave up.

Bridgeport's application of the Honeywell presumption to the facts of this

case is misplaced.  The Honeywell rule requires an applicant to rewrite a dependent

25

claim in independent form *and cancel* the original independent claim.  See

Honeywell, 370 F.3d at 1134.  When an applicant engages in such conduct, he or she

presumptively does so to narrow the dependent claim in an attempt to acquire the

sought-after patent.  See id. at 1141.  Arlington did not rewrite dependent claim 2 in

independent form, nor did it combine dependent claim 2 with independent claim 1.

Rather, it simply amended originally-filed claim 1 to include a "less than a complete

circle limitation," thereby distinguishing claim 1 from the prior art.[19]  (See Doc. 376

at 13.)  Thus, Arlington never cancelled a broader independent claim, only to

replace it with a dependent claim rewritten in independent form.[20]  The Honeywell

presumption is inapplicable and prosecution history estoppel may not serve as a

bar to Arlington's application of the doctrine of equivalents.

---

[19] The prosecution history clearly demonstrates that Arlington narrowed
originally-filed independent claim 1 by including the limitation, "said circular
spring metal adaptor being less than a complete circle when on the electrical
connector."  (See Doc. 376 at 13.)  This limitation has nothing to do with the
"outwardly sprung members" limitation that appears in claim 8 of the '050 patent
and, perhaps tellingly, Bridgeport does not clearly explain how the inclusion of the
"less than a complete circle" amendment estops Arlington from asserting the
doctrine of equivalents with respect to the outwardly sprung members limitation
presently at issue.

[20] Arlington eventually combined claims 1 and 2 of the '164 patent to produce
claim 8 of the '050 patent, which was allowed by the Examiner without objection.
(Doc. 376 at 13.)  The combination of the claims during the '050 prosecution,
however, does not implicate Honeywell.  Arlington correctly notes that "Honeywell
does not apply because Arlington never *substituted* the narrower dependent claim
(originally filed claim 2) for the cancelled broader original independent claim
(originally filed claim 1) in response to the Examiner's rejection based on [the prior
art]."  (Doc. 427 at 22.)

Bridgeport next argues that even if prosecution history estoppel does not apply, it is nonetheless entitled to summary judgment of non-infringement by equivalents.  According to Bridgeport, the accused products are not legally equivalent to Arlington's patented fittings because they do not perform substantially the same function in substantially the same way to obtain substantially the same result as each claim limitation contained in the '050 patent. See AquaTex, 479 F.3d at 1326 (explicating the Graver Tank equivalency test).  "To avoid a grant of summary judgment of non-infringement by equivalents, the patentee must present particularized evidence and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device, or with respect to the function, way, result test."  Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1382-83 (Fed. Cir. 2007) (internal quotations omitted) (quoting PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005)).  The non-movant must come forth with this particularized evidence "on a limitation by limitation basis."  Id. at 1383.

In the instant motion, Bridgeport contends that its accused products lack the equivalent of "outwardly sprung members."  (Doc. 401 at 16.)  The written description contained in the '050 patent describes the function of the Arlington fittings as threefold:

(a)    to make it easy to insert electrical connectors into electrical junction boxes, with the use of one hand instead of two;

(b)    to reduce the time involved to connect the electrical connector to the junction box; and

     (c)     to provide good electrical continuity, or ground, between the electrical connector, the junction box and the electrical source leading to the box as an integral part of the design of the connector.

(Doc. 384, Ex. A col. 1.); see also Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1090 (Fed. Cir. 1998) (directing court to focus an equivalency inquiry on "an examination of the claim and the explanation of it found in the written description of the patent").  Bridgeport concedes that its grounding tangs perform substantially the same function—namely, they provide and maintain electrical continuity between the connector, the junction box, and the electrical source leading to the box—but asserts that the tangs do so in a substantially different way to achieve a substantially different result.  (Doc. 401 at 16.)

Williamson explains that with respect to the '050 fitting, electrical continuity depends entirely upon the contact between the outwardly sprung members and the junction box walls.  (See Doc. 394, Ex. A ¶ 44.)  Thus, grounding occurs only where the outwardly sprung members physically touch the junction box walls.  In contrast, both the tensioning tangs and anchoring tabs of the accused products make contact with the junction box walls, thereby "increas[ing] the number of contact zones" and improving the fittings' ability to maintain electrical continuity between connector and junction box.  (Id.)  Auray echoes this sentiment in his deposition, wherein he notes that both the tangs and the adaptor make contact with the junction box walls, "and thereby create an excellent grounding path . . . through the knock out hole." (Doc. 305, Ex. F at 97.)  Auray describes this aspect of the accused products as "a

unique and different feature over other competitors' connectors on the market."
(Id.)

Arlington contends that such a difference is insubstantial.  Rahn points out
that the accused products' tensioning tangs "electrically and mechanically connect
the connector to the junction box" in a manner that ensures "a tight fit and good
grounding."  (Doc. 384, Ex. K ¶ 21.)  Rahn therefore concludes that the accused
products' tangs perform in substantially the same way as the outwardly sprung
members of the '050 patent, and that they achieve substantially the same result.
(Id.)  Both fittings essentially conduct ground through the use of tensioning tangs
attached to a spring metal adaptor.  Both parties present dueling experts that reach
opposite conclusions with respect to the substantiality of the differences between
the way that the accused products and the '050 device maintain electrical
continuity.  Although Bridgeport has made a case that its products conduct ground
more efficiently, it is unclear that the fittings conduct ground in a *different way*.

The proper resolution of this factual dispute is a question for the trier of fact;

summary judgment of non-infringement by equivalents will therefore be denied.[21]

### C.     Breach of the Settlement Agreement

On June 30, 2006, the court entered the confession of judgment and

injunction against Bridgeport.  (Doc. 269.)  The court specifically found that

Arlington sufficiently alleged a breach of the Settlement Agreement, which

prohibits Bridgeport's importation, manufacture, and sale of any "colorable

imitation" of its Snap-In Fitting product line.  (Id.)  After the confession of judgment

and injunction was entered, Arlington had the option of pursuing civil contempt

proceedings against Bridgeport for its alleged violation of the injunction.  See

Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 97 (3d Cir. 1981) ("[A] party violating

a consent decree may be subject to the powers by which a court protects its

---

[21] Bridgeport also asserts that the way that the accused products are inserted into a junction box is distinct from the way that the patented device is inserted. (See Doc. 401 at 17-18; Doc. 394, Ex. A ¶ 47.)  According to Bridgeport, the tensioning tangs on its products are attached to the leading end of the adaptor, allowing a user to insert the connector into the junction box with less force.  (Doc. 401 at 17.)  In response, Arlington correctly notes that the '050 device features outwardly sprung members attached to the spring metal adaptor whose function is "to make it easy to insert electrical connectors into electrical junction boxes with the use of one hand instead of two."  (See Doc. 384, Ex. A col. 1; Doc. 427 at 26-27.) Thus, in both the patented device and the accused products, tensioning tangs attached to the spring metal adaptor reduce the effort required to insert the fitting into an electrical junction box.  Bridgeport claims that by attaching the tangs at the leading end of the adaptor, it has improved the performance of the fitting's insertion function.  (Doc. 401 at 17-18.)  Even if this is true, Bridgeport's evidence does not prove that the tensioning tangs function in a *different way* than the patented device's outwardly sprung members.  The evidence simply suggests that the accused products may be inserted into a junction box with more ease.

judgments, including most notably the power of contempt under 18 U.S.C. § 401.").

Instead, Arlington chose to institute a new infringement suit.[22]

Determining whether a party has violated a patent injunction often requires

courts to discern whether a newly accused product infringes upon the patentee's

device.  The Federal Circuit has advised that "[i]f substantial issues need to be

litigated, particularly if expert and other testimony subject to cross-examination

would be helpful or necessary, the court may properly require a supplemental or

new complaint."  KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522,

1524 (Fed. Cir. 1985).  In the instant matter, Arlington asserts that Bridgeport's

Whipper-Snap products infringe its '050 patent.  The Whipper-Snap products are

arguably distinct from the "Snap-In Fittings" and in light of the legitimate factual

disputes identified supra, the court finds Arlington's tactical decision to forego

contempt proceedings and initiate an infringement suit to be entirely appropriate.

Bridgeport nonetheless requests summary judgment absolving it of

breaching the Settlement Agreement, urging the court to reject the notion that its

accused products constitute "colorable imitations" of the Snap-In Fittings.  The

extent to which a device is merely a colorable imitation of an enjoined product is

---

[22] Bridgeport criticizes Arlington for its failure to initiate a contempt
proceeding, implying that its pursuit of relief in the instant matter is in some way
an admission of legal deficiency.  (See Doc. 403 at 5-6 ("[T]he next step in this case
would be a contempt proceeding, but Arlington has failed to initiate such a
proceeding, even though this case has been pending for over two years, perhaps
because it realizes that Bridgeport's Accused Products are not 'colorable
imitations.'")).  As discussed infra, this criticism is without merit.

generally a question of equivalency, analyzed under the Graver Tank doctrine and

accompanying case law.  See id. at 1531;[23] see also Interdynamics, 653 F.2d at 98-99.

For the reasons set forth above, see supra Part III.B., the court finds material facts

in dispute regarding the equivalency of the accused products and the '050 patent.

Bridgeport's motion for summary judgment is thus premature and must be denied.

###   D.   Willful Infringement

Bridgeport seeks to foreclose Arlington's ability to obtain treble infringement

damages by moving for summary judgment on the question of willful infringement.

Section 284 of the Patent Act allows the court to "increase the damages up to three

times the amount found or assessed."  35 U.S.C. § 284.  Such an award is punitive in

---

[23] KSM is not a decision that substantively explains the law of "colorability" in patent, but rather provides courts guidance regarding the appropriate utilization of contempt proceedings versus separate infringement suits.  See KSM, 776 F.2d 1522.  Thus, the parties' prolonged discussion and polemical debate over proper application of KSM to the instant proceedings is unhelpful.  The court specifically highlights Bridgeport's selective use of quotations and ellipses to create the impression that mere questions of fact regarding the colorable similarity of a new device warrant a grant of summary judgment on behalf of the accused infringer. Compare (Doc. 403 at 6 ("[T]he court held that the critical inquiry is whether 'there are substantial open issues with respect to infringement to be tried. . . . The presence of such disputed issues creates a fair ground for doubt that the decree has been violated.  Thus, when substantial open issues regarding infringement exist regarding new products, there can be no 'colorable imitation' of old products." (citing KSM, 776 F.2d at 1532))), with KSM, 776 F.2d at 1532 ("If there are substantial open issues with respect to infringement to be tried, *contempt proceedings are inappropriate*.  The presence of such disputed issues creates a fair ground for doubt that the decree has been violated." (emphasis added)). Bridgeport's quotation implies that courts should resolve factual doubts regarding colorability by granting summary judgment in the accused infringer's favor.  This argument belies the clear holding of KSM, which is intended to provide guidance to lower courts regarding the instances in which a patentee may rightly police its patent in a contempt proceeding.

nature and "depends on a showing of willful infringement or other indicium of bad

faith warranting punitive damages." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d

1566, 1574 (Fed. Cir. 1996). The Federal Circuit recently set forth the standard for

determining whether enhanced damages for willful infringement under § 284 are

warranted:

> [P]roof of willful infringement permitting enhanced damages
> requires at least a showing of objective recklessness. Because we
> abandon the affirmative duty of due care, we also reemphasize that
> there is no affirmative obligation to obtain opinion of counsel.
>
> We fully recognize that "the term [reckless] is not self-defining."
> However, "[t]he civil law generally calls a person reckless who acts
> . . . in the face of an unjustifiably high risk of harm that is either
> known or so obvious that it should be known." Accordingly, to
> establish willful infringement, a patentee must show by clear and
> convincing evidence that the infringer acted despite an objectively
> high likelihood that its actions constituted infringement of a valid
> patent. The state of mind of the accused infringer is not relevant to
> this objective inquiry. If this threshold objective standard is satisfied,
> the patentee must also demonstrate that this objectively-defined risk
> . . . was either known or so obvious that it should have been known
> to the accused infringer.

In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (citations omitted). A

determination of willful infringement is a question for the trier of fact. Cohesive

Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1374 (Fed. Cir. 2008).

Proper adjudication of the willful infringement issue requires the factfinder

to examine the totality of the circumstances. See Liquid Dynamics Corp. v.

Vaughan Co., Inc., 449 F.3d 1209, 1225 (Fed. Cir. 2006); Minn. Mining & Mfg. Co. v.

Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1581 (Fed. Cir. 1992). For the

reasons set forth above, the court finds the issue of infringement—both literal and

under the doctrine of equivalents—to be a matter of reasonable factual dispute.

Arlington has set forth considerable evidence purporting to establish the

recklessness of Bridgeport's actions with respect to the patent dispute at hand.[24]

(See Doc. 429 at 5-21.)  Much of this evidence requires judgments of credibility and

the reasonableness of various business decisions.  Thus, the ongoing conflict

regarding the existence of infringement, coupled with the affirmative evidence of

willfulness raised by Arlington, compel resolution of this question by the jury.

Bridgeport's motion for summary judgment is therefore denied.

### E.    Limitation of the Damages Period

Finally, Bridgeport contends that it cannot be held liable for damages that

accrued prior to December 6, 2005, the date on which Arlington notified Bridgeport

that the accused products were allegedly infringing upon the '050 patent.  To

qualify for an award of damages under 35 U.S.C. § 287, a patentee must first provide

to the alleged infringer either constructive notice of the infringement—through a

"patented" mark on the infringed product itself—or actual notice of the

infringement through an "affirmative act on the part of the patentee which informs

---

[24] Arlington presents evidence that Bridgeport's attempts to copy the '050 patent have been ongoing since 1994; that Bridgeport has been permanently enjoined from infringing three separate Arlington devices, including the '050 patent; that Bridgeport executives made no attempt to obtain design advice from patent counsel and, in fact, made very little effort to ensure that its Whipper-Snap products would avoid the '050 patent.  (See Doc. 429.)  Arlington also alleges that Bridgeport ignored its own internal standard operating procedures designed to prevent the manufacture of devices with infringing designs.  (See id. at 8-9.)  These conclusions are by no means certain, but they are not *unreasonable*, mandating their eventual resolution by the jury.

the defendant of [the] infringement." <u>Amsted Indus., Inc. v. Buckeye Steel Castings Co.</u>, 24 F.3d 178, 187 (Fed. Cir. 1994); <u>see also</u> 35 U.S.C. § 287(a).  Section 287 indicates that a patentee that fails to mark its products as patented may recover damages "only for infringement occurring after" it has provided actual notice to the infringer.  <u>U.S. Philips Corp. v. Iwasaki Elec. Co.</u>, 505 F.3d 1371, 1375 (Fed. Cir. 2007).  The focus of the notification inquiry is on the actions of the patentee; the defendant's knowledge of the violation through other sources is "irrelevant." <u>Amsted Indus.</u>, 24 F.3d at 187; <u>see also</u> <u>Gart v. Logitech, Inc.</u>, 254 F.3d 1334, 1345-46 (Fed. Cir. 2001).

It is undisputed that Arlington failed to include a "patented" mark on any of its electrical fittings.  Furthermore, Arlington concedes that it provided no actual notice prior to December 6, 2005.  Rather, Arlington argues that the Settlement Agreement placed Bridgeport on continuing notice of its duty to refrain from infringing the '050 patent.  This argument misapprehends the statutory language, which requires actual notice as opposed to mere concern of potential infringement.  Section 287 mandates that the patentee take affirmative steps to protect its rights by notifying the infringer of the purported violation.  <u>Am. Med. Sys. v. Med. Eng'g Corp.</u>, 6 F.3d 1523, 1537 (Fed. Cir. 1993); <u>see also</u> <u>Arlington</u>, 290 F. Supp. 2d at 531-32.  The Settlement Agreement broadly prohibited Bridgeport from infringing Arlington's '050 patent.  However, the Settlement Agreement did not place Bridgeport on actual notice that its Whipper-Snap products infringed Arlington's patent, nor could it.  Under § 287, Arlington had the affirmative duty to police its

35

patent and, in the event it unearthed an incident of infringement, to notify the purported infringer.

The undisputed facts establish that Arlington took no action to notify Bridgeport of the alleged infringement until December 6, 2005. Consequently, Arlington is precluded from collecting patent infringement damages for the accused products' infringement prior to this date.[25]

---

[25] Whether Arlington is entitled to pre-December 6, 2005 damages as a result of Bridgeport's alleged breach of the Settlement Agreement is a matter distinct from the damages limitation imposed under § 287.

**IV.**   <u>**Conclusion**</u>

For the foregoing reasons, the court will deny Arlington's motion for summary judgment of literal infringement, as well as Bridgeport's motion for summary judgment of non-infringement.  Factual determinations regarding the physical composition of the accused products—and the extent to which those products contain the limitations recited in claim 8 of Arlington's '050 patent—remain unresolved and await proper adjudication by the finder of fact.  The court will also deny Bridgeport's motions for summary judgment of no breach of contract and non-willfulness.  Resolution of these issues is closely linked to the eventual factual determination regarding infringement.  Finally, the court will grant Bridgeport's motion to limit the damages to those accruing after December 6, 2005.

An appropriate order will issue.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      February 4, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(CONSOLIDATED)** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

------------------------------------------------------------------------

| | | |
|---|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Consolidated Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ARLINGTON INDUSTRIES, INC.,** | : | |
| | : | |
| **Consolidated Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 4th day of February, 2009, upon consideration of the motions

(Docs. 382, 385, 386, 387) for summary judgment, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 382) of infringement is DENIED.

2. Defendant's motion for summary judgment (Doc. 385) of non-infringement is DENIED.

3. Defendant's motion for summary judgment (Doc. 386) of no breach of contract is DENIED.

4. Defendant's motion for summary judgment (Doc. 387) of non-willfulness and to limit the damages period is GRANTED in part and DENIED in part as follows:

      i.       The motion to limit damages for infringement of United States Patent Number 5,266,050 to those resulting from sales made after December 6, 2005 is GRANTED.

      ii.     The motion is DENIED in all other respects.

5.      A revised pretrial and trial schedule shall issue by future order of court.

                                                           __S/ Christopher C. Conner__
                                                         CHRISTOPHER C. CONNER
                                                         United States District Judge