## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(CONSOLIDATED)** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

-------------------------------------------------------------------------

| | |
|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : |
| | : |
| **Consolidated Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **ARLINGTON INDUSTRIES, INC.,** | : |
| | : |
| **Consolidated Defendant** | : |

## <u>MEMORANDUM</u>

This is a consolidated patent infringement suit in which Arlington Industries, Incorporated ("Arlington") seeks to hold Bridgeport Fittings, Incorporated ("Bridgeport") liable for infringement, and Bridgeport seeks to invalidate Arlington's patent. Presently before the court is Bridgeport's motion in limine (Doc. 478 ¶¶ 1, 5) to exclude from trial the expert testimony of Christopher Rahn ("Rahn"), Daniel O'Neil ("O'Neil"), Thomas Gretz ("Gretz"), and Mark Gallagher ("Gallagher"). For the reasons that follow, the motion will be denied with respect to each of the witnesses.

## I.    **Factual Background**[1]

Arlington and Bridgeport manufacture and design metallic and non-metallic electrical conduit fittings. Arlington's patented fitting—United States Patent Number 5,266,050 (the "'050 patent")—features a circular spring metal adaptor, attached to which are at least two tensioning tangs bent outward at an angle relative to the normal plane of the adaptor. When the adaptor is inserted into the knockout hole of an electrical junction box, the tensioning tangs press against the junction box walls and lock the adaptor firmly into place. (See Doc. 471 at 2-3.)

Bridgeport manufactures a line of allegedly infringing electrical fittings, collectively denominated "Whipper-Snap" connectors.[2] Each model electrical fitting in the Whipper-Snap product line consists of a circular spring metal adaptor. Attached to the leading end of this adaptor are a total of four tensioning tangs and two anchoring tabs. Arlington contends that the tensioning tangs on the Whipper-Snap fittings are bent outward at an angle relative to the normal plane of the

---

[1] An extensive discussion of the underlying facts of the case appears in the court's memorandum (Doc. 471) dated February 4, 2009. See Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 610 F. Supp. 2d 370 (M.D. Pa. 2009). Familiarity with this opinion is presumed.

[2] The Whipper-Snap products accused of patent infringement in this case are designated using the following catalog numbers: 38ASP, 380SP, 651SP, 802SP, 8400SP, 846SP, 841SP, 850SP, SG38ASP, SG38SP, SG38MCIA, GF38SP, GF50SP, 8400MCIA, 851SP, BL16ASP, 840SP, BL16MCIA, BL16SP, 4501SP, 845ASP, 4502SP, 845SP, 845SPC, 651SPX, 84690SP, 802ASP, 802MCIA, SG38SPL, and 851ASP. (See Doc. 471 at 5 n.6; Doc. 522 at 16.) Arlington contends that each of these products infringe its '050 patent.

adaptor; Bridgeport asserts that the accused products' tensioning tangs are co-conical with, and lie in the normal plane of, the adaptor.  (See id. at 5-7.)

Since the above-captioned action was commenced in late 2005, the parties have engaged in extensive discovery, a Markman hearing, and summary judgment briefing; jury selection is scheduled for September 14, 2009.  In anticipation of trial, Bridgeport filed a motion in limine on June 25, 2009.  (See Doc. 478.)  Although the motion seeks to exclude nine distinct categories of evidence, the instant memorandum is limited to Bridgeport's objections to the admissibility of expert testimony proffered by Rahn, O'Neil, Gretz, and Gallagher.

## II.     Legal Standard

Admissibility of expert testimony is a question of law governed by Federal Rule of Evidence 702.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702; see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (explaining that the Rule 702 requirements constitute "the 'trilogy of restrictions on expert testimony: qualification, reliability and fit'" (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003))).  Only if expert testimony is both relevant and reliable may it be admitted at trial.  However, according to the

Third Circuit Court of Appeals,[3] Rule 702 embraces a "liberal policy of admissibility," pursuant to which it is preferable to admit any evidence that may assist the trier of fact. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

**III.    Discussion**

Bridgeport moves to preclude Rahn and O'Neil from offering testimony concerning empirical measurements that each of these witnesses performed upon the Whipper-Snap fittings. In addition, Bridgeport seeks to exclude Rahn, O'Neil, and Gretz from opining that the tensioning tangs attached to the Whipper-Snap products are "outwardly sprung." Finally, Bridgeport requests exclusion of evidence proffered by Gallagher regarding lost profits and the absence of acceptable non-infringing alternative products. The court will address each of these witnesses in turn.

**A.    Christopher Rahn**

Rahn is a doctor of philosophy in mechanical engineering and a professor of the same at the Pennsylvania State University. He has over twenty-five years' experience in the mechanical engineering field, published over fifty peer-reviewed research papers, and authored a textbook on mechatronics. (See Doc. 286, Rahn Dec. ¶ 1.) He is a self-described expert in the fields of electrical connectors,

---

[3] Admissibility of expert testimony in a patent suit is governed by the law of the regional circuit in which the district court resides. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

mechanical engineering, electrical engineering, and mechatronics. (Id. ¶ 2.)
Bridgeport makes no attempt to impugn Rahn's qualifications to testify.

Rahn was retained by Arlington as an engineering consultant and has
presented several reports throughout the litigation. In the report dated June 1,
2007, Rahn describes measurements he performed on sixty model 38ASP Whipper-
Snap connectors. (See Doc. 486, Ex. 12 ¶¶ 13-18.) Rahn explains,

> For each adaptor, three measurements were made. First, the "A"
> diameter measurement across the first pair of sprung members was
> made. Then, the "B" diameter measurement across the second pair of
> sprung members was made. Finally, the "C" diameter across the body of
> the adaptor was made. The measurements were made using a slide
> caliper with a resolution of 0.001 inches that was calibrated using a 0.800
> inch gage block.

(Id. ¶ 15.) The "A" and "B" diameters represent the trailing-end distance between
pairs of tensioning tangs, while the "C" diameter captures the distance across the
adaptor body, also at the connector's trailing end. Rahn's report indicates that 119
out of 120 pairs of tensioning tangs measured a larger diameter at the trailing end
than the corresponding trailing-end diameter across the adaptor body. (Id. ¶ 16.)
According to Rahn, this data illustrates that the "outwardly sprung members of a
random sample of the adaptors on 60 Accused Products have a larger diameter at
the trailing end than the main body of the adaptor, and are therefore bent away
from the main body. These members therefore act as 'outwardly sprung members'
according to Bridgeport's construction." (Id. ¶ 18.)

In a report dated July 27, 2007, Rahn elaborates on his findings, stating, "At
the trailing end of the adaptor, the diameters of the tensioning tangs are greater

than the diameters of the anchoring tabs.  This means that the tensioning tangs do not lie in the surface of the cone generated by the anchoring tabs and the tensioning tangs are bent toward the outside of the adaptor relative to the anchoring tabs."  (Doc. 486, Ex. 10 ¶ 21.)  Rahn concludes that the Whipper-Snap tensioning tangs are therefore "outwardly sprung members."  (Id.)  Rahn's most recent report, dated June 25, 2009, converts the diameter measurements recorded in his earlier reports to angular measurements.  After explaining the mathematics underlying the conversion, Rahn reports that the tensioning tangs on the 38ASP product are bent at an angle of 1.2 degrees away from the normal plane of the adaptor.  (Doc. 501, Ex. 4 ¶ 6.)

Arlington may present Rahn's testimony to the jury if the reliability and relevance of the evidence is established by a preponderance of proof.  See Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000); see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744-46 (3d Cir. 1994).  Reliable expert testimony is that which is based upon sound methodology and technique.  See Pineda, 520 F.3d at 247; In re Paoli, 35 F.3d at 744 (explaining that "with regard to reliability, helpfulness [to the trier of fact] turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results" (quoting DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 956 (3d Cir. 1990)).  Expert testimony that is relevant is that which is derived from reliable methods and "fits" the facts of the case in dispute, reflecting the facts in a manner that is helpful to the jury.  See Calhoun, 350 F.3d at 321; see also Daubert, 509 U.S. at 591-92.  Clearing the bar of

6

admissibility does not require that Rahn's techniques are flawless, however, for "the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702." In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999); see also In re Paoli, 35 F.3d at 744-45 (explaining that expert testimony based upon flawed methodology may nonetheless assist the jury in reaching a decision).

Rahn's measurements, and the conclusions derived therefrom, are admissible under the standard set forth in Daubert. As an initial matter, the proffered evidence is clearly relevant. Proof that Bridgeport's accused products feature outwardly sprung members is *the* central dispute of fact remaining with respect to liability. (See Doc. 522 at 6 ¶ 12; Doc. 523 at 10 ¶ 12.) Rahn offers empirical data that tends to show that the tensioning tangs on the 38ASP connector are outwardly sprung.[4] Consequently, the measurements performed by Rahn are not only relevant, but integral to Arlington's prima facie case of infringement.[5] See

---

[4] Rahn's measurements are little more than factual observations for which qualification under Rule 702 is unnecessary. After all, Rahn has personal knowledge of the measurements and Bridgeport makes no claim that the actual measuring was improperly performed.

[5] Proof of infringement may take the form of direct or circumstantial evidence. Lucent Techs., Inc. v. Gateway, Inc., 543 F.3d 710, 723 (Fed. Cir. 2008). "[T]o prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd., 501 F.3d 1307, 1313 (Fed. Cir. 2007). Bridgeport does not dispute that Rahn performed his measurements upon authentic Whipper-Snap connectors. (Doc. 518 at 5-6.) Rahn's measurements therefore make it more probable that direct infringement occurred.

35 U.S.C. § 271(a) (stating that "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent").

Rahn's testimony is also sufficiently reliable to pass the relatively low threshold required by Rule 702. See In re TMI, 193 F.3d at 665 ("[T]he standard for determining reliability is not that high, . . . .") Rahn measured the distance between the tensioning tangs and anchoring tabs using a digital caliper with a resolution of 0.001 inches, generating measurements with a margin of error of two thousandths of an inch. (See Doc. 425, Ex. 1 at 31; Doc. 486, Ex. 12 ¶ 15.) He measured the diameter between 120 pairs of tensioning tangs on sixty 38ASP connectors and has remarked upon the significant consistency among the measurements: 119 out of 120 pairs of tensioning tangs on the 38ASP device showed a larger diameter than the diameter across the corresponding adaptor body. (See Doc. 486, Ex. 12 ¶ 16; Doc. 486, Ex. 13 at 44.)

Reliability inquiries hinge upon "the process or technique the expert used" in formulating his or her opinion. Pineda, 520 F.3d at 244 (quoting Kannankeril, 128 F.3d at 806). Here, Rahn extracted empirical data by measuring actual Bridgeport products. The results that he derived were not only consistent, but recur in nearly 100% of the sixty total connectors measured. There is no contention that Rahn improperly performed these measurements or that he used faulty equipment or techniques. His methods are testable, he discloses the degree of potential measurement error, and he is unquestionably qualified. See Pineda, 520 F.3d at 247-48 (cataloguing a list of non-exhaustive reliability factors, including the

method's testability, its known or potential rate of error, and the testifying expert's qualifications).  In short, the preponderance of proof establishes both the reliability and relevance of Rahn's testimony.

Bridgeport raises a number of objections to the admissibility of this evidence, many of which purport to highlight flaws in the conclusions Rahn derives from his observations.  For example, Bridgeport claims that Rahn measured an insufficient number of connectors, that he failed to conduct a statistical analysis of his results, and that he neglected to account for manufacturing variances inherent in the accused products' mass production.  Bridgeport offers no evidence or case law to suggest that Rahn's sample size is scientifically unreliable, or that admission of his

opinions requires him to first perform a statistical analysis.[6]  Similarly, the objection

based upon possible manufacturing variances says little about the reliability of the

actual measurements that Rahn performed, and simply goes to the weight that

---

[6] Bridgeport cites to a single unreported decision purporting to support the assertion that "proposed expert testimony [may be] precluded because [the] underlying methodology—i.e. alleged small sample size, lack of control for variances, and lack of statistical analysis—precluded [the] Court from determining [a] 'known rate of error or potential for error.'" (Doc. 489 at 21 (citing Hutchinson v. Hamlet, No. C02-974, 2006 U.S. Dist. LEXIS 37734, at *4 (N.D. Cal. May 23, 2006))). Bridgeport's citation is entirely unhelpful.  In Hutchinson, which does not concern a patent dispute, the proffered expert was attempting "to establish the difference in height attributable to a person's stride and posture" by photographing *four human subjects* as they walked through a doorway where a tape measure had been placed. 2006 U.S. Dist. LEXIS 377734, at *2-3.  The proffered expert had no qualifications in bio-mechanics, nor had he recorded any data from his experiment, which was performed several years prior to the proffer.  Id. at *3.  Unsurprisingly, the court excluded the testimony.  Id. at *9-12.  At the risk of stating the obvious, an experiment performed upon four human subjects for which no data has been retained in a subject matter for which the proffered witness is unqualified is not comparable to Arlington's instant proffer.

The Hutchinson case is helpful, however, in demonstrating a glaring hole in Bridgeport's motion in limine.  In Hutchinson, the non-proponent of the testimony attacked the reliability of the proffered expert by offering declarations from two experts, both of whom critiqued the methodology of the experiment in scientific terms.  See id. at *4-6.  Bridgeport has offered no such critique.  Rather, Bridgeport flatly asserts that Rahn failed "to use an appropriate and scientifically reliable sample" without explaining, in scientific terms, why his sample was inappropriate or what an appropriate sample would look like.  (See Doc. 489 at 11.)

Rahn's conclusions should be afforded.[7]  See ACCO Brands, Inc. v. ABA Locks Mfr.

Co., Ltd., 501 F.3d 1307, 1313 (Fed. Cir. 2007) (explaining that specific instances of

direct infringement amounts to liability in the context of patent infringement

litigation).

Furthermore, underlying each of these arguments is the contention that

Rahn should have considered something that he did not.  When evaluating the

admissibility of expert testimony, however, the court need not conclude that "a

particular scientific opinion has the best foundation, or even [that] the opinion is

supported by the best methodology or unassailable research."  In re TMI, 193 F.3d

at 665.  Rather, an expert's proffered opinion is admissible if supported by "good

grounds"—once the court satisfies itself that such grounds are present, further

critique is better left for cross examination.  See id. ("The grounds for the expert's

opinion merely have to be good, they do not have to be perfect.  The judge might

think that there are good grounds for an expert's conclusion even if the judge

thinks that there are better grounds for some alternative conclusion, and even if the

---

[7] Bridgeport asserts that because the Whipper-Snap devices are produced on a mass scale, manufacturing variances may cause minor deviations from the accused products' engineering specifications.  Assuming *arguendo* that such manufacturing variances exist, they fail to make Rahn's measurements of Bridgeport's ready-for-sale products irrelevant or unreliable.  Patent infringement is a strict liability offense.  In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed Cir. 2007).  Bridgeport's hypothetical manufacturing variances argument may be explored with Rahn on cross examination, but it is insufficient to prevent Rahn from testifying.

judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

In this fashion, Bridgeport's arguments concerning sample size, statistical analysis, and manufacturing variance are more appropriate subjects for cross examination. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence."). Similarly, Bridgeport's complaints that Rahn neglected to measure the diameter across unmounted tangs,[8] as well its theory regarding the inward movement of the anchoring tabs,[9] are valid areas on which to interrogate Rahn at trial. Neither argument demonstrates either the unreliability of Rahn's measurements or that his testimony lacks relevance.[10]

---

[8] Bridgeport contends that "[i]n order to show that the diameter of the tensioning tangs changed, Rahn must compare measurements of the tensioning tangs before and after mounting on the adaptor." (Doc. 489 at 14 n.6.) This argument is of questionable relevance. The parties agree that the "accused products" are "fully assembled connectors with the adaptors placed on the connector body." (Doc. 383 ¶ 11(b); Doc. 439 ¶ 11(b)). Arlington need not show that the tangs' diameter changes upon assembly in order to prove liability.

[9] Bridgeport claims that the "anchoring tabs move *inward* . . . when the adaptor is mounted onto the connector body." This theory is also of questionable relevance. As stated above, see supra note 8, the accused products are fully assembled connectors; liability simply hinges upon the presence of outwardly sprung members present on the fully assembled device.

[10] Bridgeport also claims that Rahn's measurements are unreliable because they are inconsistent with the measurements obtained by O'Neil. Although several of Rahn and O'Neil's measurements differ by thousandths of an inch, this goes to the weight of testimony, not its admissibility.

Bridgeport also attacks the "fit" of Rahn's analysis to the instant matter. Bridgeport contends that Rahn's measurements of the 38ASP are irrelevant to prove any other Whipper-Snap models infringe the '050 patent. This assertion is correct but does not warrant exclusion of Rahn's testimony.[11] If Bridgeport is concerned that the jury will confuse models, such concerns are more properly addressed via limiting instruction. Lastly, Bridgeport registers disquiet with the "origination, foundation, [and] chain of custody" of the sixty inspected 38ASP devices. (Doc. 489 at 5.) Bridgeport observes that "it is unknown: 1) where the connectors originated from; 2) how they were selected for testing; or 3) what might have been done to them prior to being furnished to O'Neil."[12] (Id.) This objection is rather strange, given Bridgeport's concession that the 38ASP connectors were authentic, as well as the total absence of evidence to suggest any of the untoward activity that Bridgeport's argument implies. Within reasonable bounds, Bridgeport is free to explore this issue in more detail on cross examination. However, the court will not exclude Rahn's testimony based upon Bridgeport's unsupported supposition.

---

[11] The court notes that during the pretrial conference, counsel for Arlington advised that Rahn has now completed measurements upon all of the models it accuses of infringement. (See Doc. 571 at 4-5.) Indeed, these additional measurements are the subject of a supplemental report, and the court has permitted opposing counsel to depose Rahn on his supplemental report. Accordingly, it is anticipated that all of these measurements will be presented at trial. (See id. at 4-21, 61.)

[12] O'Neil apparently tested the connectors before forwarding them on to Rahn. (See Doc. 489 at 5.)

## B.    Daniel J. O'Neil & Thomas Gretz

O'Neil is an Arlington employee and is credited as an inventor of the '050 patent.  In early 2007, O'Neil performed measurements upon the sixty 38ASP connectors that served as the subject of Rahn's investigation.  Like Rahn, O'Neil measured the diameter between pairs of tensioning tangs at the trailing end, as well as the diameter across the trailing end of the adaptor body.  These measurements were taken using a digital caliper device and subsequently recorded.  O'Neil's findings demonstrate that on every connector he examined, the diameter across the trailing end of the tensioning tangs was "always greater" than the diameter across the adaptor body.  (See Doc. Doc. 501, Ex. 2.)

Gretz is a mechanical engineer and vice president of Arlington.  He is also credited as an inventor on the '050 patent.  Gretz compares Bridgeport's Whipper-Snap connectors to the infringing models it manufactured as part of its Snap-In Fittings line.  Gretz states, *inter alia*, that "[i]n both Fittings, the diameter of Bridgeport's outwardly sprung members at the trailing end of the adaptor is wider than the leading end and is larger than the diameter of the knockout hole [of an electrical junction box]."  (Doc. 433, Ex. C ¶ 8.)  Gretz presents several photographs comparing Bridgeport's infringing Snap-In devices to those in the Whipper-Snap catalogue, and he opines that the Whipper-Snap tensioning tangs are functionally identical to those that were featured on the Snap-In Fittings.  (See id. ¶¶ 8-9.)

Bridgeport contends that neither O'Neil or Gretz should be permitted to testify because both witnesses failed to submit expert reports as required by

Federal Rule of Civil Procedure 26. Bridgeport also objects to the relevance and reliability of O'Neil's measurements, as well as the conclusions he draws therefrom. The court will first address Bridgeport's arguments concerning Rule 26 before addressing the content of O'Neil's proffered testimony.

### 1.    **Disclosure of Expert Testimony**

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires litigants to disclose the identity of any individual who may provide opinion testimony pursuant to Federal Rules of Evidence 702, 703, or 705. See FED. R. CIV. P. 26(a)(2)(A). Those witnesses "retained or specially employed to provide expert testimony" or "whose duties as the party's employee regularly involve giving expert testimony" must also prepare and disclose a written expert report. See FED. R. CIV. P. 26(a)(2)(B). This report must contain a complete statement of the expert's opinions and the reasons therefor, the data considered by the expert, the expert's qualifications, and the compensation paid for both the report and for trial testimony. See id. The reporting requirement of Rule 26(a)(2)(B) is inapplicable, however, to those witnesses who are employees of a party and whose duties do not regularly involve the provision of expert testimony. See FED. R. CIV. P. 26(a) advisory committee's note (1993); see also Paper Mill Holding Co., Ltd. v. D.R. Horton, Inc., Civ. A. No. 08-2074, 2009 WL 189936, at *3 (E.D. Pa. Jan. 26, 2009) (holding that expert reports were unnecessary when proffered witnesses were not "retained expert[s]"); Allfirst Bank v. Ortenzio, Civ. A. No. 1:CV-01-0786, 2002 WL 34381142, at *2 (M.D. Pa. June

6, 2002) (Rambo, J.) (stating that the drafters of Rule 26 did not intend the written report requirement to apply to "non-retained fact/expert witnesses").

This court has previously explained that "[a] principal purpose of Rule 26(a)(2) is to permit a 'reasonable opportunity to prepare effective cross examination and . . . arrange for expert testimony from other witnesses.'" Allfirst Bank, 2002 WL 34381142, at *3 (quoting FED. R. CIV. P. 26(a)(2) advisory committee's note (1993)) (alteration in original). The rule is primarily intended to "eliminat[e] unfair surprise." Reed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996) (quoting Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 284 (8th Cir. 1995)). Therefore, even in those instances in which a litigant fails to provide a written report, courts often require production of a report and, if necessary, the opportunity for pretrial deposition, as opposed to exclusion of the testimony. See Paper Mill Holding, 2009 WL 189936, at *3 (allowing party to depose rebuttal witnesses prior to provision of trial testimony); Dyson Tech. Ltd. v. Maytag Corp., 241 F.R.D. 247, 248-50 (D. Del. 2007) (ordering party to provide written information upon which expert opinions were based when disclosure was incomplete); KW Plastics v. United States Can Co., 199 F.R.D. 687, 690-91 (M.D. Ala. 2000) (requiring witness to provide disclosures and make himself available for deposition). In the instant matter, Bridgeport does not request either a supplemental disclosure or a second opportunity to depose O'Neil or Gretz; rather, Bridgeport simply moves to preclude these Arlington employees from testifying. (See Doc. 489 at 25-26.)

The court finds that neither O'Neil or Gretz was required to provide Bridgeport with a written report, and that both individuals may present testimony pursuant to Federal Rules of Evidence 702, 703, or 705.[13] O'Neil and Gretz are Arlington employees whose duties do not primarily involve the provision of expert testimony. <u>See</u> <u>Allfirst Bank</u>, 2002 WL 34381142, at *2. Furthermore, both witnesses were properly disclosed pursuant to Rule 26(a)(2)(A). Specifically, on February 6, 2007, Arlington provided Bridgeport notice that O'Neil and Gretz may be used at trial to present expert testimony. (<u>See</u> Doc. 501, Ex. 1.) Bridgeport deposed both individuals on or before April 24, 2007. (<u>See</u> Doc. 501, Exs. 6-7.) Between April 24, 2007 and the filing of the instant motion in limine, Bridgeport failed to request a supplemental written report or a second deposition. Perhaps more importantly, there is no indication that the opinions of either witness have undergone a material change since the time that each was last deposed. O'Neil and Gretz may be aware of additional Bridgeport products that entered the market after April 2007, and they may be aware of measurements and sales data for such products, but this information is not testimony for which expert qualification is required. Therefore, even if O'Neil or Gretz were required to produce a written report, their failure to do so has not prejudiced Bridgeport in any discernible way. The motion for exclusion on Rule 26 grounds will thus be denied.

---

[13] Although Arlington has indicated that it intends to present O'Neil as an expert witness pursuant to Rule 702, it appears that O'Neil could properly testify as a lay witness under Rule 701. <u>See</u> <u>infra</u> Part III.B.2.

### 2. O'Neil's Measurements

O'Neil measured sixty 38ASP connectors and recorded the observations he derived therefrom. On each of the sixty connectors, O'Neil measured the trailing-end diameter between the two pairs of tensioning tangs, and the diameter across the adaptor body. Based upon the measurements he recorded, O'Neil states that the tensioning tang diameter on each adaptor was greater than that across the corresponding adaptor body. Bridgeport admits that the connectors O'Neil measured were authentic, and there is no contention that he was not qualified to measure these devices. In order to provide the above-described testimony, O'Neil need not be qualified as an expert pursuant to Rule 702. Rather, under Rule 701, O'Neil may discuss those opinions that are rationally based upon his perception. See FED. R. EVID. 701. Bridgeport's motion to exclude his testimony on Daubert grounds is therefore inapplicable. Should O'Neil proffer testimony requiring his qualification as an expert under Rule 702, Bridgeport is free to re-raise its Daubert objections and the court will address them at that juncture.

### C. Mark Gallagher

Gallagher is Arlington's retained damages expert. He is a certified public accountant and fraud examiner with over thirty years of investigative accounting experience. (See Doc. 504, Ex. 8.) Gallagher generated a written report, which is dated June 1, 2007, wherein he assumes that Bridgeport is liable for infringement, and calculates the damages suffered by Arlington as a result thereof. (See id.) Bridgeport claims that Gallagher's lost profits analysis should be excluded because

18

(1) he applied an erroneous standard, (2) he is an accountant as opposed to a technical expert, and (3) his report lacks a proper foundation. These claims will be addressed *seriatim*.

In order to recover damages in the form of lost profits, a patentee must establish that "but for" the infringement, it would have captured the infringer's sales. Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed. Cir. 2003); Fuji Photo Film Co. v. Jazz Photo Corp., 249 F. Supp. 2d 434, 454 (D.N.J. 2003) ("In order to recover lost profits, a patent owner must demonstrate 'a causal connection between the infringement and its loss of profits.'" (quoting Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed. Cir. 1993))). One method of demonstrating "but for" causation is via the four-prong test set forth in Panduit Corp. v. Stahlin Brothers Fibre Works, 575 F.2d 1152 (6th Cir. 1978). The Panduit test requires that a patentee prove: (1) a demand for the product during the period in question; (2) an absence of acceptable non-infringing substitutes; (3) its own manufacturing or marketing capability to exploit the demand; and (4) a computation of the profits it would have accrued. Id. at 1156; see also Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1373 (Fed. Cir. 2008) (citing Standard Havens Prods., Inc. v. Gencor Indus., Inc., 953 F.2d 1360, 1373 (Fed. Cir. 1991)). Satisfaction of the Panduit test raises a presumption of "but for" causation in favor of the patentee with respect to the entirety of the infringer's sales. Fuji Photo, 249 F. Supp. 2d at 454.

Gallagher purports to apply the four <u>Panduit</u> factors in order to discern Arlington's lost profits. (<u>See</u> Doc. 504, Ex. 8.) However, Bridgeport contends that "Gallagher's conclusion [finding] no acceptable non-infringing substitutes is based on a fundamental misunderstanding of the required analysis." (Doc. 490 at 6.) Specifically, Bridgeport argues that Gallagher utilizes an incorrect standard to determine whether acceptable non-infringing substitute products are available in the marketplace. Because he allegedly applied an incorrect standard, Bridgeport claims that Gallagher's conclusions are not reliable and must be excluded pursuant to Rule 702 and <u>Daubert</u>. <u>See</u> <u>Pineda</u>, 520 F.3d at 247 (stating that reliable expert testimony is that which is based upon sound methodology and technique).

Gallagher describes the standard that he applied as follows: "In order to be an acceptable non-infringing substitute, [the product] must contain all advantages of the patented product. Thus, the mere existence of a competing device does not necessarily make that device an acceptable substitute." (Doc. 504, Ex. 8 (internal citations and quotations omitted)). He goes on to survey the electrical connector market and concludes that no connector "contain[s] all of the advantages or characteristics of the patented connector, and therefore, there are no acceptable non-infringing substitutes." (<u>Id.</u>) In subsequent testimony, Gallagher clarified his understanding of the applicable standard, explaining that an acceptable non-infringing substitute need not have *all the patented features*, but simply must possess *all the advantages* of the patented device. (<u>See</u> Doc. 489, Ex. 6 at 85-86 (stating that "to be an acceptable noninfringing alternative, [the product] does [not]

have to have all the patented features in all cases" and observing, "I can think of cases where it is conceivable that an acceptable noninfringing alternative may not have all the patented features")). The standard applied by Gallagher—which he sets forth in his report and through his deposition testimony—is the standard required by the Federal Circuit. See Standard Havens, 953 F.2d at 1373 ("A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages."); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1166 (Fed. Cir. 1991) ("If purchasers are motivated to purchase because of particular features of a product available only from the patent owner and infringers, products without such features would obviously not be *acceptable infringing substitutes*."). Gallagher's testimony is therefore sufficiently reliable to be admitted under Rule 702.[14]

---

[14] Bridgeport claims that when Gallagher's report states that an acceptable non-infringing substitute "must contain all advantages of the patented product," (see Doc. 504, Ex. B), he *means* that an acceptable non-infringing substitute must contain every feature of the patented device, (see Doc. 490 at 6-7). It is, of course, unnecessary that an acceptable non-infringing alternative possess every feature of the patented product, for, "by definition, noninfringing products do not represent an embodiment of the invention." SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1166 (Fed. Cir. 1991). After examining Gallagher's report and deposition testimony, however, the court is satisfied that Gallagher did not mis-apply the standard. Rather, Gallagher surveyed the market for products that offered the advantages of the Arlington connectors. Bridgeport's motion seems to overemphasize what is—at best—an ambiguity in Gallagher's report. The court will permit Bridgeport to explore this ambiguity on cross examination.

Bridgeport raises two additional arguments, neither of which require exclusion of Gallagher's expert testimony. Bridgeport contends that Gallagher is not qualified to offer an opinion on the presence of acceptable non-infringing substitute products in the electrical connector market. (See Doc. 490 at 7-8.) Bridgeport cites no case law to support its contention. Frankly, given the relative frequency with which accountants are permitted to offer lost profits testimony in infringement suits, see, e.g., Ericsson, 352 F.3d at 1376-77 (admitting accountant testimony on lost profits when accountant's opinions were independently supported by testimonial and documentary evidence); Aspex Eyewear, Inc. v. E'Lite Optik, Inc., No. Civ. A. 3:98-CV-2296-D, 2002 WL 1751381, at *36 (N.D. Tex. Apr. 4, 2002) (permitting accountant damages expert to testify regarding the absence of non-infringing substitutes in the magnetic eyewear market); Omniglow Corp. v. Unique Indus., Inc., 184 F. Supp. 2d 105, 124 (D. Mass. 2002) (allowing "economic expert" to offer opinion on the absence of acceptable non-infringing substitutes in the chemiluminescent products market), Bridgeport's argument is anemic. Although Gallagher must possess specialized expertise in order to provide opinion testimony under Daubert, Rule 702's qualification requirement is a liberal one. See Pineda, 520 F.3d at 244. Gallagher is sufficiently qualified to meet this requirement,

especially in light of the uncontested case law permitting accountants to offer such testimony.[15]

Bridgeport next claims that Gallagher's opinion regarding the existence of acceptable non-infringing substitute products lacks foundation. (See Doc. 490 at 8-12.) In particular, Bridgeport complains that Gallagher relies on "information obtained from third parties," as well as information "obtained from Arlington" concerning prior art locknut connectors.[16] Under Federal Rule of Evidence 703, reliance on such information is entirely appropriate provided that such information is of the type reasonably relied upon by damages experts in patent liability suits. See FED. R. EVID. 703 (explaining that information "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" need not be admissible in order for the court to admit the opinion testimony); see also DeLuca, 911 F.2d at 952-53 (holding that a district court's application of Rule 703 must focus not upon "what the court deems reliable, but what experts in the relevant discipline deem" to be reliable (internal quotations omitted)). Bridgeport does not contend that it is improper for a damages expert to

[15] The court notes with interest that Bridgeport's proffered damages expert is also a certified public accountant who opines on the existence of acceptable non-infringing substitute products in the electrical connector market. (See Doc. 528, Ex. A.)

[16] Gallagher's report states that he relies upon the testimony of both Bridgeport and Arlington employees, market data supplied by the companies, and litigation documents such as the parties' responses to interrogatories. (See Doc. 508, Ex. 8.) The totality of information relied upon by Gallagher in formulating his opinion is extensive, and appears at Appendix A of his report. (See Doc. 508, Ex. 8.)

rely upon market data or the testimony of market actors,[17] but merely takes issue

with the conclusions Gallagher draws from the underlying facts and data that he

examined.  This is the purview of cross examination.  Bridgeport's objections will

accordingly be denied.

**IV.**   **Conclusion**

For the reasons set forth above, the court will deny Bridgeport's motion in

limine (Doc. 478 ¶¶ 1, 5) to exclude the testimony of Rahn, O'Neil, Gretz, and

Gallagher.

An appropriate order follows.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      September 10, 2009

---

[17] It is perhaps illustrative to note that Bridgeport's damages expert, Carol
Ludington ("Ludington"), relied upon evidence very similar to that which
underlyies Gallagher's report.  (See Doc. 528, Ex. A.)  As basis for her testimony,
Ludington reviewed, among other things, the testimony of Bridgeport and
Arlington employees, market data, and various litigation documents exchanged by
the parties.  (See id.)  The reliance of both damages experts on essentially similar
material at the very least suggests that such evidence is the type of information
experts in the field deem to be reliable.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARLINGTON INDUSTRIES, INC., | : | CIVIL ACTION NO. 3:01-CV-0485 |
| | : | |
| Plaintiff | : | (CONSOLIDATED) |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| BRIDGEPORT FITTINGS, INC., | : | |
| | : | |
| Defendant | : | |

-------------------------------------------------------------------------

| | |
|---|---|
| BRIDGEPORT FITTINGS, INC., | : |
| | : |
| Consolidated Plaintiff | : |
| | : |
| v. | : |
| | : |
| ARLINGTON INDUSTRIES, INC., | : |
| | : |
| Consolidated Defendant | : |

## <u>ORDER</u>

AND NOW, this 10th day of September, 2009, upon consideration of

Bridgeport Fittings' motion in limine (Doc. 478 ¶¶ 1, 5) to preclude Daniel O'Neil

and Thomas Gretz from proffering any testimony, and specifically barring O'Neil,

Gretz, and Christopher Rahn from testifying about their measurements of the

accused Whipper-Snap Connectors or from testifying that any measurements or

testing indicate that the accused Whipper-Snap connectors are outwardly sprung,

and to preclude Arlington from introducing testimony from Mark Gallagher

concerning lost profits or the absence of acceptable non-infringing alternatives, and

for the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that Bridgeport's motion (Doc. 478 ¶¶ 1, 5) is DENIED.


                                    <u>  S/ Christopher C. Conner  </u>
                                    CHRISTOPHER C. CONNER
                                    United States District Judge