# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| Plaintiff | : | **(CONSOLIDATED)** |
| v. | : | **(Judge Conner)** |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| Defendant | : | |
| ------------------------------------------------------------------------- | | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| Consolidated Plaintiff | : | |
| v. | : | |
| **ARLINGTON INDUSTRIES, INC.,** | : | |
| Consolidated Defendant | : | |

## **MEMORANDUM**

Presently before the court are two post-trial motions concerning the propriety of permanent injunctive relief. The first, filed by Arlington Industries, Incorporated ("Arlington"), seeks a permanent injunction prohibiting Bridgeport Fittings, Incorporated ("Bridegport") from making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import any of the thirty Whipper-Snap connector models adjudged infringing in the above-captioned matter. (See Doc. 641.) The second motion, filed by Bridgeport, requests that the court stay enforcement of the 2006 confession of judgment and injunction

(Doc. 270) entered by the court in 2006.  (See Doc. 649.)  For the reasons that follow, both motions will be granted.

I. **Relevant Background & Procedural History**[1]

This patent infringement dispute focuses upon the market for electrical conduit fittings, which are typically used to connect electrical wiring and cable in a commercial construction site.  In 1992, Arlington developed a new type of fitting whose uniquely-designed tensioning tangs allowed a user to more quickly connect the device to a junction box, thus saving significant time and expense.  According to Arlington executive Thomas Gretz ("Gretz"), the quick-connect fitting was an instant market success:

> [T]here was nothing on the market at the time like it that I know of. . . . [The product was] [a]ccepted very well.  It was basically a very phenomenal product.  We were getting constant phone calls on the first introductions.  We were getting calls from every section of the country.  We were sending samples out.  It was just, just well received.

(Doc. 655 at 117-18.)  Arlington eventually obtained several patents on this quick-connect fitting, including, *inter alia*, United States Patent 5,266,050 (the "'050 patent").

Arlington practices the invention taught by the '050 patent through its "Snap Tight" product lines and has sold over 550 million units of these products since their invention in 1992.  (Id. at 120.)  Over time, Arlington has attempted to maintain its position as the market's sole manufacturer of quick-connect products; thus, it

---

[1] The parties are familiar with the circumstances of the present dispute and, therefore, the court will relate only information that is pertinent to this memorandum.

2

refuses to license the patents for its quick-connect devices to any competitor. (See id. at 223.) Bridgeport is, in fact, the sole company that manufactures an acceptable market alternative to Arlington's Snap-Tite products. (See id. at 95-96, 234-36; Doc. 658 at 58-62.) Because there are only 5,000 distributors of quick-connect fittings throughout the United States, competition between the two companies is intense. (See Doc. 655 at 88, 94-95.)

Bridgeport first entered the quick-connect fitting market in 1999, when it designed its own connectors called the "Snap-In" and "Speed-Snap" fittings. Arlington eventually sued Bridgeport for manufacturing these products, arguing that the Snap-In and Speed-Snap devices infringed the '050 patent. The litigation proceeded for three years only to settle on the eve of trial. The two competitors then entered into a consent decree on April 7, 2004, wherein Bridgeport (1) stipulated to the '050 patent's validity, (2) admitted that its Snap-In and Speed-Snap fittings infringed the '050 patent, and (3) submitted to entry of a permanent injunction prohibiting it from making, using, selling, offering for sale, or importing the infringing products or "any colorable imitation of such products."[2] (See Doc. 270.)

Approximately one year later, Bridgeport designed a new quick-connect fitting, which it denominated the "Whipper-Snap." Although Bridgeport claimed that it had designed around the '050 patent and its enjoined devices, counsel for Arlington informally accused the Whipper-Snap connector models of patent

---

[2] The court entered this confession of judgment as a federal injunction on June 30, 2006. (See Doc. 270.)

3

infringement in December 2005. Arlington's accusation prompted Bridgeport to seek a declaratory judgment of non-infringement, in response to which Arlington countersued with claims of both infringement and breach of contract. (See Doc. 471 at 8.)

On May 31, 2006, Arlington filed a parallel suit for infringement before the Honorable A. Richard Caputo. (See Bridgeport Fittings, Inc. v. Arlington Indus., Inc. ("Arlington II"), No. 3:06-CV-1105 (M.D. Pa.), Dkt. No. 1.) Arlington therein alleged that two of Bridgeport's Whipper-Snap connector models—catalog numbers 3838ASP and 3838SP (hereinafter the "duplex connectors")—were infringing both the '050 patent and United States Patent Number 6,521,831 (the "'831 patent"). During the course of this lawsuit, Judge Caputo construed claim 8 of the '050 patent in a way that was inconsistent with the undersigned's construction of the same claim in the above-captioned matter. Arlington II thereafter proceeded to summary judgment, and Judge Caputo held that the duplex connectors did not infringe the '050 patent as a matter of law. Arlington's decision to prosecute parallel litigation on the same patent claim has complicated the instant suit considerably, a point to which the court will return below.[3]

A jury trial in the above-captioned matter commenced on September 14, 2009. After two weeks of presentation, the jury returned a verdict that twenty-nine of the accused Whipper-Snap products literally infringed claim 8 of the '050 patent, and that one connector, the 802ASP, infringed claim 8 under the doctrine of

---

[3] For a more detailed explanation of the parallel litigation and the difficulties engendered by this trial strategy, see Dkt. No. 584 and Dkt. No. 773 at 9-20.

4

equivalents. (See Doc. 632.) In addition, the jury held that twenty-six connector models were colorable imitations of the enjoined Snap-In and Speed-Snap connectors. The jury awarded infringement damages of $2,772,373 in lost profits and $662,278.54 in reasonable royalties. The jury awarded $2,780,555 in damages for Bridgeport's breach of contract. (See id.) The court thereafter entered the jury's verdict as a non-final judgment on October 7, 2009. (See Doc. 638.)

Bridgeport has continued to sell and market each of the products adjudged infringing by the jury. (See Doc. 698, Ex. 1.) On September 28, 2009, counsel for Arlington delivered a cease and desist letter to Bridgeport executive Delbert Auray, demanding that Bridgeport discontinue sales and marketing for each of the twenty-six connector models found to be colorable imitations of the enjoined devices. (See id., Ex. 2.) Counsel for Bridgeport responded to this correspondence on October 1, 2009, explaining that sales of the products would continue until a final verdict was entered in the instant matter. (See id., Ex. 3.) Such sales ostensibly continue to the present.

In its present motion, Arlington seeks a permanent injunction barring Bridgeport "from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper-Snap Products" held infringing herein. (See Doc. 641 at 2.) Bridgeport objects to imposition of a permanent injunction, but also urges the court

5

to stay enforcement of an injunction in the event that one is imposed.[4] According to Bridgeport, it is manifestly inequitable to enjoin its continued sale of Whipper-Snap products in light of the judgment of non-infringement issued by Judge Caputo in Arlington II. Consequently, Bridgeport requests that the court maintain the status quo pending the Federal Circuit Court of Appeals' review of the instant matter and Arlington II. The court will first address Arlington's motion for an injunction before turning to Bridgeport's request for a stay.

## II. Discussion

### A. Motion for a Permanent Injunction

Section 283 of the Patent Act expressly provides that district courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent." 35 U.S.C. § 283. A patent infringement claimant requesting a permanent injunction must satisfy a four-factor test before acquiring such relief. Specifically, a patentee must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;

---

[4] Bridgeport's motion specifically requests that the court stay enforcement of the 2006 confession of judgment and injunction. (See Doc. 649.) However, in its opposition to Arlington's motion for a permanent injunction, Bridgeport also requests that, in the event the court grants Arlington a permanent injunction for infringement, that it stay enforcement of the injunction pending appellate review. (See Doc. 732 at 13-18.) The grounds underlying both Bridgeport requests are identical, and the court will therefore construe Bridgeport's motion (Doc. 649) to stay enforcement of the 2006 permanent injunction as a motion to stay both that injunction and any injunctive relief which the court may impose as a result of the most recent finding of infringement.

6

and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). Courts often consider the irreparable harm and lack of an adequate remedy at law factors together, for the former contemplates the inherent inadequacy of legal relief. See Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008).

### 1. **Irreparable Harm & Lack of Adequate Remedy at Law**

The grant of a patent, by its very nature, bestows the right to exclude competitors from infringing activity. See Reebok Int'l v. J. Baker, Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994). When infringing activity occurs, however, recompense by money damages may be insufficient to compensate the intrusion, and injunctive relief is often necessary to preserve the legal interests of the parties against future infringement. See Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246-47 (Fed. Cir. 1989); Acumed, 551 F.3d at 1328. Courts examine numerous factors to ascertain the extent of the injury, including the patentee's licensing behavior; evidence of past harm to the patentee's market share, revenues, and brand recognition; and the existence of a two-supplier market composed of the patentee and defendant. See i4i L.P. v. Microsoft Corp., 589 F.3d 1246, 1275 (Fed. Cir. 2009) (explaining that "[p]ast harm to a patentee's market share, revenues, and brand recognition is relevant for determining" irreparable injury); Acumed, 551 F.3d at 1328-29 (considering whether patentee granted "previous licenses, the identity of past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer"); Mass Engineered Design, Inc. v. Ergotron, Inc., 633 F. Supp. 2d 361, 393 (E.D. Tex.

2009) (holding that the "fact that there is direct competition [with the infringer] in the marketplace weighs heavily in favor of a finding of irreparable injury"); TruePosition Inc. v. Andrew Corp., 568 F. Supp. 2d 500, 531 (D. Del. 2008) ("Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor.").

In the instant matter, Arlington and Bridgeport are direct market competitors in a two-supplier market, contending for the business of 5,000 nationwide distributors of quick-connect electrical fittings. Each sale of a Bridgeport connector likely deprives Arlington of market share, revenue, and brand recognition. In light of these market dynamics, the court concludes that Bridgeport's infringement has seriously affected Arlington's market position. See i4i L.P., 589 F.3d at 1276 (finding irreparable harm when defendant caused patentee to lose market share and alter its business strategy); TruePosition Inc., 568 F. Supp. 2d at 531-32 (finding irreparable harm when defendant's infringement caused patentee to lose business, goodwill, and harmed its reputation). Furthermore, Arlington strategically declines to license the patent on its quick-connect device and, instead, exploits its monopoly to exclude potential rivals. According to Gretz, Arlington "would never, ever, ever license [the '050 patent] to Bridgeport." (Doc. 655 at 223.) Arlington's licensing behavior illustrates the insufficiency of money damages for future infringement, for financial remuneration alone will not restore Arlington's position as the exclusive non-infringing supplier of quick-connect products. See Acumed, 551 F.3d at 1328-29 (weighing licensing behavior as one

factor in irreparable harm analysis). The collective weight of these factors compels a conclusion that Arlington will be harmed in a manner for which financial recompense is inadequate, and thus the first two factors favor injunctive relief.

### 2. **The Balance of Hardships**

The balance of hardships inquiry "assesses the relative effect of granting or denying an injunction on the parties." i4i L.P., 589 F.3d at 1277. A court may consider "the parties' sizes, products, and revenue sources," id., but it should not scrutinize the effect of equitable relief upon an infringer's customers, or examine the infringer's costs and expenses in designing its infringing products, see Acumed, 551 F.3d at 1330. In short, "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." Broadcom Corp. v. Qualcomm, Inc., 543 F.3d 683, 704 (Fed. Cir. 2008).

The court finds that the balance of hardships tips in Arlington's favor. Arlington is the market leader in quick-connect fittings, its Snap-Tite product line is one of its highest volume products, and it has sold over 550 million units since bringing the product to market. (See Doc. 661 at 138; Doc. 665 at 223.) Arlington does not license its product and, as a result of Bridgeport's infringement, it has suffered a decline in market share in what is a two-supplier market. In contrast, the Whipper-Snap products constitute but thirty of Bridgeport's 2,000 different products. (See Doc. 660 at 236); see also i4i L.P., 589 F.3d at 1277 (finding balance of hardships in patentee's favor when infringing product "relates to only a small

9

fraction of [defendant's] sizable business"). In light of the Snap-Tite's significant importance to Arlington, and the serious effect of infringement to its market position, the court finds that this factor favors equitable relief.[5]

### 3. **Public Interest**

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i L.P., 589 F.3d at 1277. This factor typically "favors the patentee, given the public's interest in maintaining the integrity of the patent system." MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 586 (E.D. Va. 2007). "Where products do not relate to a significant compelling public interest, such as health or safety, this factor weighs heavily in favor of an injunction." Mass Engineered Design, 633 F. Supp. 2d at 394. The court finds that the public interest is best served by imposition of a permanent injunction. Quick-connect electrical conduit fittings do not relate to public health or safety concerns and, moreover, even if they did, the public will not be deprived of these products. Arlington has demonstrated that it has the capacity to capture all of Bridgeport's infringing sales and Bridgeport's continued infringement has effected a significant harm. The public's interest in maintenance of the patent system compels issuance of an injunction.

---

[5] Bridgeport proffers several arguments based upon the hardship that its customers will incur if sales of the Whipper-Snap are enjoined. (See Doc. 732 at 9-11.) However, the hardship to Bridgeport's customers is irrelevant to the court's inquiry. See Acumed, 551 F.3d at 1330.

10

In sum, each of the four factors spelled out by eBay favor the imposition of a permanent injunction. The court will therefore enjoin Bridgeport from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper-Snap products adjudged infringing by the jury, or any colorable imitations of these products. The injunction will be effective upon entry of final judgment, and expires on December 4, 2011.[6]

### B. Motion to Stay Injunction Pending Appeal

Pursuant to Federal Rule of Civil Procedure 62(c), "the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(c). "The purpose of staying an injunction pending appeal is to preserve the status quo." Kawecki Berylco Indus., Inc. v. Fansteel, Inc., 517 F. Supp. 539, 540 (E.D. Pa. 1981). A motion under Rule 62 goes to the discretion of the trial court, which must inquire: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Feesers, Inc. v. Michael Foods, Inc., Civ. No. 1:CV-04-0576, 2009 WL 1684650, at *1 (M.D. Pa. June 16, 2009); Sentry Ins. v. Pearl, 662 F. Supp. 1171, 1173 (E.D. Pa. 1987). The court must consider each of these elements, balance the

---

[6] The '050 patent was issued on November 30, 1993, (see PX01), and expires December 4, 2011, (see Doc. 641 at 2; Doc. 732 at 8-9).

11

equities, and discern whether the movant can demonstrate a likelihood of success on the merits on appeal. See First Amendment Coalition v. Judicial Inquiry & Review Bd., 584 F. Supp. 635, 636-37 (E.D. Pa. 1984) (quoting Evans v. Buchanan, 424 F. Supp. 875, 879-80 (D. Del. 1976), aff'd as modified, 555 F.2d 373 (3d Cir. 1977)); Kawecki, 517 F. Supp. at 540; 11 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2904, at 502-03 (2d ed. 1995).

The first factor in the Rule 62 analysis—whether Bridgeport is likely to succeed on the merits on appeal—favors a stay. The court has encountered unusual circumstances with the presentation of Bridgeport's res judicata argument. The undersigned was first made aware of the potential for conflicting judgments on the eve of trial, and explained at the pretrial conference that it was "very concerned about the issue of collateral estoppel, res judicata, claim preclusion, but . . . also very concerned about the costs and expenses that have been incurred to date to get this case where it is, and . . . it is ready for trial." (Doc. 571 at 60-61.) This concern did not abate throughout the trial and, in the memorandum and order of court (Doc. 773) dated March 2, 2010, the court concluded that issue preclusion applies to the judgment reached in Arlington II. (See id. at 12-17.) While the court has declined to apply that doctrine in light of the very unique circumstances present in this case, there is no doubt that Bridgeport has a reasonable possibility of success on appeal. See Combustion Sys. Servs. v. Schuykill Energy Resources, 153 F.R.D. 73, 74 (E.D. Pa. 1994) (granting stay when plaintiff possessed a "reasonable possibility of success on the merits of its post trial motions or appeals"); First

Amendment Coalition, 584 F. Supp. at 636-38 (explaining that a stay is appropriate when "there is a reasonable possibility—albeit not a probability—that [the court] was in error").

Arlington contends that "the possibility that the Federal Circuit may overturn this Court's claim construction does not constitute an extraordinary circumstance warranting a stay in this case." (Doc. 738 at 11-12 (citing cases)). This argument misses the point. It is not the inconsistent claim construction in Arlington II that weighs in favor of a stay, but the possibility that the *final judgment* in that matter precludes the jury verdict herein. Although the court has worked assiduously to avoid substantive or procedural error, it cannot deny the unique circumstances of parallel litigation and conflicting claim construction. Furthermore, Arlington cannot be heard to complain on this point, for it chose to initiate parallel litigation on the same patent claim. In the usual case, "irrespective of which action or proceeding was first brought, it is the first final judgment rendered in one of the courts which becomes conclusive in the other as *res judicata*." Chicago, R.I. & P.R. Co. v. Schendel, 270 U.S. 611, 616-17 (1926). In this fashion, it is the applicability of issue preclusion to the instant jury verdict, not the mere fact that Judge Caputo construed claim 8 differently, which provides Bridgeport with a reasonable possibility of success on appeal.

The court also concludes that Bridgeport will suffer irreparable injury absent a stay of injunction. According to Bridgeport executive William Manthey,

13

Bridgeport's lost sales alone will amount to approximately $3,300,000.[7] (Doc. 699 ¶ 2.) Moreover, the market for quick-connect electrical fittings features but two suppliers. Should the court enjoin production of Bridgeport's Whipper-Snap connectors, 100% of its sales will flow to Arlington. The resulting loss of customer goodwill and market share may well be irreplaceable. This factor therefore weighs in favor of maintenance of the status quo.

The third factor in the Rule 62 analysis examines whether issuance of a stay will substantially injure the nonmovant. As discussed above, Bridgeport's continuing infringement will harm Arlington in a manner for which financial remuneration is inadequate. Thus, there is no question that Arlington will suffer substantial injury by granting a stay of the permanent injunction. As the market leader, however, Arlington is not exposed to any greater injury by a stay than those Bridgeport will suffer without a stay. Moreover, the extent of a nonmovant's injury is but one factor in the Rule 62 analysis. The court finds that the serious question of law posed by the conflicting infringement judgments simply outweighs Arlington's potential injury. What is more, imposition of a stay will place Arlington in a position identical to that which it has occupied since 2006. This is not to minimize Arlington's injury, but to suggest that it can continue to compete successfully in the marketplace until a decision is rendered by the Federal Circuit.

Finally, the court finds that the public interest lies in granting a stay of the permanent injunction. While it is no doubt true that the public interest typically

---

[7] This figure assumes that the appeal process takes eighteen months. (See Doc. 699 ¶ 2.)

favors maintenance of a patentee's property rights, see Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006), consistency of judgments weighs even heavier in the court's analysis, see Montana v. United States, 440 U.S. 147, 153-54 (1979) (explaining that reliance on judicial action requires that courts "minimiz[e] the possibility of inconsistent decisions"). There is a reasonable possibility that Bridgeport will ultimately prevail on its res judicata arguments and, in the event that this occurs, the jury verdict rendered herein shall stand as an inconsistent judgment. Such a result inherently undermines the integrity of the law and compels the court to maintain the status quo pending appellate review.

Upon consideration of the four factors required by Rule 62, the court concludes that it is appropriate to stay the 2006 confession of judgment and injunction, and the permanent injunction described in Part II.A. In order to secure this stay, Bridgeport must post a bond sufficient to safeguard Arlington's rights. See FED. R. CIV. P. 65(c). Neither party has directly addressed the bond requirement, but the court will do so below.

### C. Supersedeas Bond

The bond requirement in Rule 62(c) is intended "to preserve the status quo during the pendency of an appeal, [protecting the winning party] from the possibility of loss resulting from the delay in execution." HCB Contractors v. Rouse & Assocs., 168 F.R.D. 508, 512 (E.D. Pa. 1995) (alterations in original) (discussing bond requirement in context of Rule 62(d)). "The propriety of any security posted is a discretionary determination made by the court." Silver v. Mendel, Civ. A. No. 86-

15

7104, 1992 WL 163285, at *1 (E.D. Pa. July 8, 1992); see also Cashman Equip. Corp. v. U.S. Fire Ins. Co., Civ. A. No. 06-3259, 2008 WL 5000355, at *4 (E.D. Pa. Nov. 21, 2008). The court finds that the most appropriate manner in which to secure Arlington's rights pending appellate disposition is to calculate future damages as a result of Bridgeport's infringing activity. This calculation should extend through the expiry of the '050 patent, even if there is a possibility that an appellate disposition precedes this date.

In order to calculate this bond, the court has utilized the analysis provided by Arlington's damages expert, Mark Gallagher ("Gallagher"). According to Gallagher's third supplemental expert report, Arlington's 2008 lost profits damages for both infringement and breach of contract amount to $1,281,292.80.[8] (See PX397.) Arlington was therefore suffering $106,774.40 per month in lost profits damages in 2008. At this monthly rate, Arlington will suffer approximately $2,882,908.80 from the entry of non-final judgment in October 2009 through December 2011.[9] The court finds that a supersedeas bond of 25% of $2,882,909, or $720,727.25, will adequately secure Arlington's rights pending appellate disposition. Thus, Bridgeport shall be required to post a bond in this amount before a stay of injunction becomes effective.

---

[8] The court has used the calculations for calendar year 2008 because Gallagher's corresponding calculations for 2009 were based on only a portion of the calendar year.

[9] The court recognizes that the damage amount is approximate, but the purpose here is to secure Arlington's right, and not to make Arlington whole.

16

## III. **Conclusion**

For the foregoing reasons, the court shall grant Arlington's motion for a permanent injunction. From the date that final judgment is entered, Bridgeport shall be enjoined from directly or indirectly making, using, selling, offering for sale, or importing, or causing or inducing others to make, use, sell, offer to sell, or import, the Whipper-Snap products adjudged infringing by the jury, or any colorable imitations of these products. The court shall also grant Bridgeport's motion to stay both this injunction and the 2006 confession of judgment and injunction pending disposition by the Federal Circuit Court of Appeals. The stay shall be effective upon posting of a supersedeas bond in the amount of $720,727.25.

An appropriate order follows.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:    March 9, 2010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| Plaintiff | : | **(CONSOLIDATED)** |
| v. | : | **(Judge Conner)** |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| Defendant | : | |

-----------------------------------------------------------------

| | | |
|---|---|---|
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| Consolidated Plaintiff | : | |
| v. | : | |
| **ARLINGTON INDUSTRIES, INC.,** | : | |
| Consolidated Defendant | : | |

## **ORDER**

AND NOW, this 9th day of March, 2010, upon consideration of the motion (Doc. 641) for a permanent injunction, filed by Arlington Industries, Incorporated, and the motion (Doc. 649) to stay enforcement of the 2006 permanent injunction, filed by Bridgeport Fittings, Incorporated, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 641) for a permanent injunction, filed by Arlington Industries, Incorporated, is GRANTED as follows:

    a. Bridgeport Fittings, Incorporated, its officers, agents, attorneys, servants, employees, successors, assigns and all those in active concert or participation with them, who receive actual notice of this injunction by personal service or otherwise, are permanently enjoined from directly or indirectly making, using, selling, offering for sale or importing or causing or inducing others to make, use, sell, offer to sell, or import the Whipper-

    Snap products identified in this action as models 38ASP, GF38SP, SG38ASP, 8400SP, 850SP, 651SP, 802SP, 841SP, GF50SP, 380SP, SG38SP, 846SP, SG38MCIA, SG38SPL, 840SP, 4502SP, 4501SP, 845SPL, BL16ASP, 851ASP, 845SP, 802MCIA, BL16MCIA, 851SP, 845ASP, 8400MCIA, BL16SP, 84690SP, 651SPX, 802ASP (collectively, "Whipper-Snap products"), or any colorable imitation of such Whipper-Snap products during the term of United States Patent Number 5,266,050, which expires on December 4, 2011, or until said patent is declared invalid or unenforceable by a court of competent jurisdiction, from which no further appeal is possible, whichever occurs first.

  b. The permanent injunction described herein shall be effective upon entry of final judgment in the above-captioned matter.

2. The motion (Doc. 649) to stay enforcement of the 2006 permanent injunction, filed by Bridgeport Fittings, Incorporated, is CONSTRUED as a motion to stay both the 2006 permanent injunction (Doc. 270) and the injunction described in Paragraph 1(a) of this order, and is GRANTED as follows:

  a. The injunction described by Paragraph 1(a) of this order shall be STAYED pending appellate disposition. Stay of the injunction shall be effective upon Bridgeport Fittings, Incorporated's posting of the supersedeas bond described by Paragraph 3 of this order.

  b. The confession of judgment and injunction (Doc. 270) entered on June 30, 2006 shall be STAYED pending appellate disposition. Stay of the injunction shall be effective upon Bridgeport Fittings, Incorporated's posting of the supersedeas bond described by Paragraph 3 of this order.

3. The stays of injunction described in Paragraph 2 shall not be effective until Bridgeport Fittings, Incorporated posts a bond in the amount of $720,727.25. See FED. R. CIV. P. 65(c).

                S/ Christopher C. Conner
                CHRISTOPHER C. CONNER
                United States District Judge