# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Presently before the court is a motion (Doc. 845) for entry of judgment on supplemental damages filed by plaintiff Arlington Industries, Inc. ("Arlington"). For the reasons set forth below, the court concludes that Arlington is entitled to lost profits damages, but will defer entry of judgment on the precise amount of damages pending supplemental memoranda by the parties.

## I.      <u>Background</u>[1]

On September 25, 2009, a jury found that defendant Bridgeport Fittings, Inc.'s ("Bridgeport") Whipper-Snap Connectors infringed Arlington's patent, United States Patent 5,266,050 ("the '050 patent"). (Docs. 632, 638). The jury awarded Arlington damages for both infringement and breach of contract. (Id.) On March 3, 2010, the court amended the judgment to omit infringement damages because they were duplicative of the breach of contract damages. (Doc. 774). The

---

[1] The parties are intimately familiar with the factual background of this case; therefore, the court will only recite the procedural history pertinent to the instant motion.

court also awarded Arlington pre-judgment interest on the breach of contract damages. (Id.)

On March 9, 2010, the court granted Arlington a permanent injunction, effective on final judgment, enjoining Bridgeport from making or selling the infringing connectors. (Doc. 776). Bridgeport opposed the permanent injunction and, in the alternative, requested a stay pending appellate review of a related case. (Doc. 732). Bridgeport also moved to stay a 2006 injunction. (Doc. 686 at 11-12). The court stayed both injunctions pending appellate review in the related case. (Doc. 776).

The court entered a final judgment on March 29, 2010. (Docs. 789, 790). The court entered an amended final judgment on April 28, 2010 and awarded to Arlington lost profits for the period of July 1, 2009 through February 28, 2010. (Docs. 798, 799). Arlington succeeded on appeal in the related case, and it subsequently moved to lift the court's stay of the injunctions. (Doc. 808). The stays of Arlington's injunctions were lifted effective June 23, 2011. (Doc. 835). The injunctions ended on December 4, 2011, when Arlington's '050 patent expired.

On December 12, 2012, Arlington filed the instant motion (Doc. 845) seeking supplemental damages and pre-judgment interest for any of Bridgeport's infringing sales made from March 1, 2010 to December 4, 2011 ("the contested period").[2] Arlington's damages expert, Mark Gallagher ("Gallagher"), used updated financial

---

[2] Arlington concedes that Bridgeport did not make any infringing sales when the injunctions were in effect from June 23, 2011 to December 4, 2011. (See Doc. 876-2 at 3 n.1).

information from Arlington and Bridgeport's sales data, and he calculated

Arlington's supplemental damages as $1,000,040.10 in lost profits and $98,601.63 in

pre-judgment interest.[3] (Doc. 849-2 ¶ 6).

Bridgeport does not dispute that Arlington is entitled to supplemental

damages for the contested period. (See Doc. 859). However, Bridgeport disputes

Arlington's assertion that Arlington is entitled to lost profits damages simply

because that was the designated measure of damages before March 1, 2010.

Bridgeport's arguments contra lost profits damages may be distilled into two main

assertions: 1) that the products were no longer competing in a two-supplier market

and that acceptable, non-infringing substitutes for the product existed during the

contested period; and 2) that the court may not assume that Arlington would have

made 100% of Bridgeport's accused sales because changing market conditions and

Bridgeport's revamped marketing strategy affected brand loyalty and price

elasticity during the contested period. Bridgeport also contends that the court

should consider Arlington's sales from the approximately five month period –

June 23, 2011 to December 4, 2011 – when the injunctions were in effect. For these

reasons, Bridgeport requests limited discovery as well as a hearing to establish the

proper measure and amount of supplemental damages.

Arlington responds that Bridgeport is barred from contesting Arlington's

entitlement to lost profits damages for the contested period under the legal

---

[3] Gallagher used the state statutory rate of six percent, under 41 P.S. § 202, that the court has previously used in its calculation of pre-judgment interest to Arlington for sales up to February 28, 2010. (See Docs. 774, 789, 798, 799).

doctrines of judicial and collateral estoppel.  (See Docs. 846, 876-2).  Arlington

asserts that the jury, this court, and the Federal Circuit already rejected all of

Bridgeport's arguments against Arlington's right to lost profits damages.  (See Doc.

632; Doc. 773 at 44-49; Doc. 841).  The motion is fully briefed and ripe for

disposition.

## II.    Discussion

The court must award a successful claimant damages "adequate to

compensate for the infringement, but in no event less than a reasonable royalty for

the use made of the invention by the infringer."  35 U.S.C. § 284.  Damages may be

calculated in two ways under the applicable statutory provisions.  "If the record

permits the determination of actual damages, namely, the profits the patentee lost

from the infringement, that determination accurately measures the patentee's loss."

Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983).  "If

actual damages cannot be ascertained, then a reasonable royalty must be

determined."  Id.

To recover damages in the form of lost profits, a patentee must

establish a reasonable probability that "but for" the infringement, it would have

captured the infringer's sales.  Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377

(Fed. Cir. 2003); Fuji Photo Film Co. v. Jazz Photo Corp., 249 F. Supp. 2d 434, 454

(D.N.J. 2003) ("In order to recover lost profits, a patent owner must demonstrate 'a

causal connection between the infringement and its loss of profits.'" (quoting Bic

Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed. Cir. 1993))).

4

Such a showing requires the patentee to "reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product." Ericsson, 352 F.3d at 1377. A patentee's market reconstruction must be founded upon "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999). When the patentee has established an inference of "but for" causation, the burden shifts to the infringer to show that this inference is unreasonable for some or all of the lost sales. Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed. Cir. 1995).

Patent owners may resort to any market reconstruction theory that establishes "but for" causation using reliable economic evidence. See Ericcson, 352 F.3d at 1377. At trial, Arlington proffered evidence under both a two-supplier market theory and the familiar Panduit test. The two-supplier theory holds that "[w]hen the patent owner and infringers were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringers." Del Mar Avionics v. Quinton Instr. Co., 836 F.2d 1320, 1327 (Fed. Cir. 1987). To succeed under the two-supplier theory, a patentee must show "(1) the relevant market contains only two suppliers, (2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and (3) the amount of profit it would have made from these diverted sales." Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003). The Panduit test requires that a patentee prove: (1) a demand for the product during the period in question;

5

(2) an absence of acceptable non-infringing substitutes; (3) its own manufacturing

or marketing capability to exploit the demand; and (4) a computation of the profits

it would have accrued.  Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152,

1156 (6th Cir. 1978); see also Cohesive Techs. v. Waters Corp., 543 F.3d 1351, 1373

(Fed. Cir. 2008) (quoting Standard Havens Prods., Inc. v. Gencor Indus., Inc., 953

F.2d 1360, 1373 (Fed. Cir. 1991)).

When a jury does not find damages, "the court shall assess them."  35 U.S.C.

§ 284.  Choice of methodology to compute a damages award is within the trial

court's sound discretion.  Paper Converting Machine Co. v. Magna-Graphics Corp.,

745 F.2d 11, 21 (Fed. Cir. 1984).  Contrary to Bridgeport's assertions, the court is not

necessarily required to hold an "accounting hearing" to determine supplemental

damages for the contested period.  Indeed, the Federal Circuit has explained that

the term "accounting" is merely synonymous with an "award of damages."  Magna-

Graphics, 745 F.2d at 14; Ecolab, Inc. v. FMC Corp., 569 F.3d 1335, 1353 n.5 (Fed.

Cir. 2009) (explaining an accounting as the calculation and award of damages for

post-verdict sales).  There is no case law dictating a specific procedure to follow in

awarding damages.  The court must simply base its decision on findings of fact for

the time period subject to the accounting.

Based on the parties' submissions, the court possesses sufficient record

evidence to find that Arlington is entitled to *lost profits* damages for the contested

period.  Additional discovery, supplemental briefing, or a hearing on this issue is

unnecessary. Indeed, the parties have submitted to the court over 200 pages of briefing, declarations, and evidence.

At trial, Arlington established that it is entitled to lost profits damages. Arlington Vice President Thomas Gretz ("Gretz") and Gallagher provided trial testimony, which the jury found credible, that the market at issue is comprised of only two suppliers. (See Doc. 655 at 216, 219-21; Doc. 658 at 53-58). Specifically, Gallagher explained the manner in which Bridgeport mimicked Arlington's pricing strategies and coached its salespeople to compare Bridgeport and Arlington products. (See Doc. 658 at 53-58). Gretz testified to the similarity in both parties' customer base, and stated that no other company sells quick-connect fittings similar to Arlington and Bridgeport's products. (See Doc. 655 at 216, 219-21). Gretz and Gallagher also testified to the lack of acceptable non-infringing substitutes in the quick-connect fitting market. (See Doc. 655 at 234-36; Doc. 656 at 71-72). Based upon this testimony, the jury awarded Arlington lost profits and pre-judgment interest. The court subsequently denied Bridgeport's motion for judgment as a matter of law, concluding that there was sufficient evidence to support the jury award of lost profits damages. (Doc. 773 at 44-49). The Federal Circuit affirmed the court's final judgment, including the lost profits award. (Doc. 841). Thereafter, the parties agreed that Arlington was entitled to lost profits damages for the period of July 1, 2009 to February 28, 2010. (See Docs. 783, 786, 789, 799).

This factual and procedural backdrop strongly supports the finding of a "reasonable probability" that Arlington is entitled to lost profits damages for the

7

contested period. In his affidavit, Gallagher calculates the additional award for the contested period by applying updated financial information to the same method of calculation that the jury used to award damages and that the court used in its April, 2010 final judgment. (Doc. 849-2 ¶ 6). In his affidavit, Gretz states that market conditions did not change during the contested period. (Doc. 847 ¶ 8). He further attests that, during the contested period, there were "no snap-in products offering the same selling features and advantages as Arlington's products other than the Bridgeport products." (Id. ¶ 6). He states that "Bridgeport's infringing connectors are the only real competition that Arlington has had for its Snap-Tite Connectors over the past seven years." (Id. ¶ 7).

Under the two-market supplier theory and the Panduit test, Arlington has established a reasonable probability that "but for" Bridgeport's infringement, it would have captured Bridgeport's sales during the contested period. The burden now shifts to Bridgeport to show that Arlington is not entitled to lost profits.

Bridgeport alleges that the parties' respective products were no longer competing in a two-supplier market during the contested period. Bridgeport's technical sales manager, Eric Cerasale ("Cerasale"), cites the following "competing" products that were purportedly introduced into the market since 2009: Halex's 85403NB and 95403NB; Raco's 2700, 2700-8, and 2700-AJ; Thomas and Betts' XC-130; Topaz's 130SNP; Crouse Hinds' Quick Pro 38 MCQ, manufactured by Sigma; and Madison Electric's MDS38, manufactured by Sigma. (885-10 ¶ 24). Cerasale overlooks the fact that the parties presented *all* of these products – with the

8

exception of Crouse Hinds' Quick Pro 38 MCQ and Madison Electric's MDS38 – in front of the jury at trial. (Doc. 655 at 250-255, 259-263; Doc. 876-4 ¶¶ 14-20). Moreover, Crouse Hinds' Quick Pro 38 MCQ and Madison Electric's MDS38 are actually identical products, and they were *not* on the market from March 2010 to June 2011. (Doc. 876-4 ¶ 19).

Cerasale also cites a number of purportedly competing products that were in the market before 2009: AFC-Cable Systems' AFC-50; Bridgeport's AMC-50; EGS-O-Z Gedney's AMC-50; Halex's 65705B; Madison Electric's MAFC-50; and Raco's 2800. (Doc. 885-10 ¶ 28). These six products are actually two electrical connectors marketed under several companies' brands. (Doc. 876-4 ¶ 24). The parties presented iterations of both of these products in front of the jury during trial. (Doc. 655 at 252-257, 265-266; Doc. 876-4 ¶¶ 21-26). In sum, the record is devoid of any *new* products that were not presented to the jury at the 2009 trial. The court is convinced that Bridgeport and Arlington continued to compete in a two-supplier market during the contested period.

Bridgeport alleges that Arlington recently conceded (in related litigation) that an acceptable, non-infringing substitute existed during the contested period. On December 17, 2012, during a hearing for Arlington's motion for contempt in Case No. 3:02-00134, counsel for Arlington discussed a Halex connector with its witness, Dr. Christopher Rahn. (See Case No. 3:02-00134, Doc. 178 at 113-115). Contrary to Bridgeport's allegation, the transcript of this argument is devoid of any admission by either counsel for Arlington or Dr. Rahn that the Halex product is an

acceptable, non-infringing substitute.  Indeed, Dr. Rahn mentions this product only as an example of a product that does not infringe another one of Arlington's patents because it does not possess the same advantages as the Arlington product.

Bridgeport alleges that market conditions significantly changed during the contested period.  In its brief and accompanying declarations by Eric Cerasale and Carol Ludington, Bridgeport identifies certain changes in its marketing strategy.  It asserts that it refocused its marketing campaign to highlight various features of its products which are lacking in Arlington's products.  (See Doc. 859 at 13- 17; Doc. 885-2 ¶¶ 6-16; Doc. 885-10 ¶¶ 34-35).  Bridgeport claims that this revamped marketing strategy has resulted in a higher demand for Bridgeport's products and increased brand loyalty.  (Id.)  Bridgeport also asserts its lower prices have increased its market share, because the recent economic downturn has dissuaded certain price-conscious consumers from purchasing Arlington's higher priced products.  (Id.; Doc. 885-2 ¶ 17; Doc. 885-10  ¶¶ 25-33).  Finally, Bridgeport generally chronicles the decline in sales which both parties experienced during the contested period, apparently attributable to the decline of construction activity.  (Id.; Doc. 885-10  ¶¶ 20-24).

Bridgeport does not clearly articulate how an overall decline in market sales affects Arlington's *entitlement* to lost profits (as opposed to merely the amount). Moreover, Bridgeport does not explicitly identify why its changed marketing strategies and the potential price elasticity between the parties' products are at all relevant to the court's inquiry.  Ostensibly, Bridgeport is attempting to assert that

Arlington did not possess the manufacturing and marketing capability to make Bridgeport's sales. Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003). This argument is unavailing as it simply rehashes similar factual assertions that were raised, considered, and rejected at trial. (See Doc. 876-3 ¶ 36). Bridgeport fails to establish, beyond pure speculation, that price differences between Arlington and Bridgeport's products impacted any purchasing decisions or that there was a causal connection between its changed marketing focus and increased demand.

Bridgeport requests further discovery to analyze Arlington's sales during the approximately five month period – June 23, 2011 to December 4, 2011 – when Bridgeport's infringing products were not in the market. Bridgeport asserts that this five month period will help to shed light on whether "but for" Bridgeport's infringement, Arlington would have captured its sales. The court is not persuaded that Arlington's sales from this relatively short time period could accurately reflect the profits Arlington would have made if the market had developed absent Bridgeport's infringing product. Bridgeport fails to rebut the reasonable inference that Arlington is entitled to lost profits damages under either the two-supplier theory or the Panduit test. The court will grant Arlington lost profits damages for the contested period.[4]

The court must now determine whether to adopt Gallagher's calculations of lost profits damages and pre-judgment interest for the contested period. Gallagher calculates Arlington's lost profits damages as $1,000,040.10 and pre-judgment

---

[4] The court's conclusion that Arlington is entitled to lost profits damages renders Arlington's judicial and collateral estoppel arguments moot.

interest as $98,601.63. (Doc. 849-2 ¶ 6). Gallagher calculated the pre-judgment

interest at the state statutory rate of six percent, based on the court's previous use

of this rate to award breach of contract damages for Bridgeport's sales up to

February 28, 2010. (See Docs. 774, 789, 798, 799). The court would be inclined to

adopt Gallagher's calculations, except that he also includes calculations for four

Bridgeport model numbers that the jury found infringed Arlington's '050 patent but

were not included in Arlington's breach of contract claim: 4502SP, 4501SP,

84690SP, and 802ASP.[5] (Doc. 849-2, Schedule 1; Doc. 632). Moreover, Gallagher

includes calculations for four Bridgeport model numbers that were not listed on the

verdict form as subject to the jury's decision for either patent infringement or

breach of contract: 560MCIA, 560ASP, 560SP, and 850SP OEM.[6] (Doc. 849-2,

Schedule 2; Doc. 632).

In light of these discrepancies, the court will direct the parties to submit

supplemental memoranda on the precise amount of damages. Arlington is entitled

to recover damages and pre-judgment interest for the model numbers subject to the

jury's breach of contract finding. Hence, it shall re-calculate the lost profits

---

[5] Of these four connectors, Gallagher only records Bridgeport selling one type – 84690SP – during the contested period. (Doc. 849-2, Schedule 1). Gallagher reports that Arlington's lost profits from Bridgeport's sales of this 84690SP amounted to $146.12 during the contested period. (Doc. 849-2, Schedule 2).

[6] Of these four connectors, Gallagher records Bridgeport selling two types – 560SP and 850SP OEM – during the contested period. (Doc. 849-2, Schedule 1). Gallagher reports that Arlington's lost profits from Bridgeport's sales of 560SP amounted to $171.10 during the contested period. (Doc. 849-2, Schedule 2). Arlington's lost profits from Bridgeport's sales of 850SP OEM amounted to $133,847.67 during the contested period. (Id.)

damages amount and pre-judgment interest amount for those connectors using the same methods Gallagher used in his declaration. (Doc. 849-2). If Arlington intends to seek damages and pre-judgment interest for the model numbers subject to the jury's patent infringement finding, the court will require briefing on the appropriate pre-judgment interest rate grounded in principles of federal law. Further, Arlington shall re-calculate the award using that new interest rate and the lost profits calculation method Gallagher used in his declaration. (Id.) Bridgeport shall then have an opportunity to respond.

## III.   **Conclusion**

For the foregoing reasons, the court finds that Arlington is entitled to lost profits damages for the contested period but will defer entry of judgment on the exact amount pending supplemental memoranda by the parties. An appropriate order follows.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:       July 17, 2013

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLINGTON INDUSTRIES, INC.,** | : | **CIVIL ACTION NO. 3:01-CV-0485** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIDGEPORT FITTINGS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 17th day of July, 2013, upon consideration of plaintiff's

motion (Doc. 845) for entry of judgment on supplemental damages, and for the

reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Within twenty (20) days of the court's order, Arlington shall submit a supplemental memorandum proposing the appropriate calculation and amount of lost profits damages for the contested period. This memorandum shall not exceed 2,500 words in length.

2. Within twenty (20) days of Arlington's filing, Bridgeport shall respond with any objections to Arlington's proposal. This response shall not exceed 2,500 words in length.

3. No further memoranda shall be permitted without leave of court.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge